Quarteze MOORE, Appellant,

v.

UNITED STATES, Appellee.

No. 01–CF–673.

District of Columbia Court of Appeals.

Argued Dec. 15, 2003.
Decided April 8, 2004.

Erin Murphy, Public Defender Service, with whom James Klein, Timothy P. O'Toole, and Karin Pita Loor, Public Defender Service, were on the brief, for appellant.

Mary B. McCord, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese III, and Kenneth R. Behle, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Appellant was found guilty by a jury of assault with intent to kill while armed and related offenses, all stemming from a shooting in daylight on February 1, 1997, in which Conrad Perry was shot repeatedly at close range, including a shot to the head that left him blind. The issues on appeal arise from the fact that Perry told a police officer—Detective Kasul—a week after the assault that the shooter had worn a mask over his face. Perry's statement about the mask was not revealed to the defense until Detective Kasul testified as the last witness in the government's case in chief. Appellant now contends that the belated disclosure amounted to the suppression of material evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and relatedly, that the trial court's decision to permit recross-examination of some but not all of the government's witnesses in light of the new information violated his Sixth Amendment right to confront witnesses. Unpersuaded by either contention, we affirm.

I.

In the statement to Detective Kasul in which Perry said that the person who shot him wore a mask, he nonetheless identified appellant as the shooter, explaining that he knew appellant because he had gone to school with him. Several weeks later, Perry again identified appellant to Kasul as the shooter, but denied that appellant's face had been covered. At trial Perry confirmed that he had known appellant since junior high school (and also because appellant and others had sold drugs in his neighborhood); and he identified appellant in court as the person who on February 1, 1997, had approached him from the back and, as Perry turned halfway around, shot him in the eye from a couple of steps away and then shot him again multiple times.

Perry's identification of appellant was corroborated by three eyewitnesses. Aniese Holston was looking out of her apartment window at the time and saw Perry and appellant standing together. A short while later she left the apartment house and, as she walked up the street, again saw the two men standing together. Appellant then walked down the street out of her view, reappeared after a brief time, and reached into his pocket, at one point looking over at Holston ("[h]e ... looked me in the eyes"). He put a gun to Perry's head and fired it. As Perry ran past Holston, appellant followed him and fired additional shots. Holston had known appellant through his grandmother for "about ten years[,] if that long."[1]

---

1. Holston admitted that following her grand jury testimony she had gone to the Public Defender Service on her own initiative and told an attorney there that she had lied to the

Tracy Carey had known appellant casually since about 1991 (or for six years at the time of the shooting). Before the shooting she had been sitting on steps outside her building with Tijuana Beynum, when Perry approached and asked them for a light for his cigarette. Appellant was across the street, and Carey watched as he walked to the first-floor window of a building down the street, opened the window, and came back up the street toward Perry pointing a gun. Standing next to Perry, he shot him three or more times.

Beynum testified in similar fashion. She had known appellant from junior high school and around the neighborhood since 1992. After Perry approached her and Tracy for a cigarette light, he crossed the street and appeared to ask appellant and two other persons for a light. Appellant then walked down the street to an abandoned building, moved a board that covered a window, and retrieved a gun. He then walked back up the street and shot Perry in the side of the face, at a distance of some fifteen feet from where Beynum sat. Perry tried to run away, but then fell as appellant chased him and fired additional shots.[2]

Additionally, April Johnson, appellant's former girlfriend and the mother of his daughter, testified that on an occasion be-fore the shooting, she saw a group of men including Perry fire shots at appellant's car. Two days after Perry was shot, Johnson was staying at appellant's house when she overhead his father ask him why he had shot Perry, to which appellant replied that "[b]asically he was tired of them robbing him, shooting up his car and just bothering him." The next day Johnson heard appellant tell his brother "what he did and how he did it," including the fact that "when he was shooting [Perry] his gun had got jammed and he tried to fix it and he couldn't and so he ran."[3]

## II.

Despite this array of testimony, appellant contends that the belated disclosure of Perry's statement to Detective Kasul about the mask was tantamount to "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense," *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that his inability to make use of it in preparing for trial, crafting his defense strategy, and especially in cross-examining government witnesses made that information "material" within the meaning of *Brady*, requiring reversal. Specifically, he argues that Per-

grand jury in incriminating appellant. At trial, she explained that she had told that to the PDS attorney falsely—*i.e.*, her grand jury and trial testimony were in fact true—because she "didn't want to come to trial" or "to be a part of this whole situation."

**2.** In cross-examining Beynum, appellant's counsel attempted to show that she—and implicitly Carey, who was with her—could not have seen the shooting because her usual habit was to sit on her back porch when socializing with friends—a vantage point from which she admitted the shooting would not have been visible. But she insisted that she had been seated on the steps to the porch from which she could see the events.

**3.** On cross-examination, Johnson admitted that during the investigation she had felt pressured by the police, who had made her feel that if she did not "tell them what they wanted to hear they were going to make things very difficult for [her]," in particular that she might lose custody of her children. On redirect, however, she insisted that while the police had "wanted [her] to say that [she was] there [on the scene] and saw the shooting" when in fact she had not seen it, her testimony—both to the grand jury and at trial—about overhearing appellant's confessions was truthful and not the result of coercion by anyone.

ry's statement, had he learned of it in time to exploit it fully at trial, might reasonably have "put the whole case in such a different light as to undermine confidence in the verdict," *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (footnote omitted) (explaining *Brady* materiality standard); or, in the Supreme Court's alternative formulation, it would have created a "reasonable probability" of a different outcome. *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

■ This argument, we observe initially, cannot be based on a claimed inability to impeach the complainant Perry with his prior inconsistent statement[4] or, indeed, to confront Detective Kasul with the statement in an effort to cast doubt on the diligence with which the police investigated other possible suspects. When appellant moved for a mistrial in light of the belated disclosure, the trial judge denied the motion but allowed appellant to conduct a full cross-examination of both Perry and Detective Kasul outside the jury's presence to decide whether appellant then wished to call those witnesses for recross-examination before the jury. At the close of the voir dire, appellant's counsel declined to recall either witness and instead chose to urge on the jury in closing argument the negative implications of the discrepancy between Kasul's testimony and Perry's silence on the stand about the mask, as well as of the government's suppression of Perry's prior statement:

> The government put on a detective who said that Conrad Perry told him that the shooter was wearing a mask. The government did not ask Conrad Perry about this mask. Isn't it interesting that Detective Kasul, whose testimony you can believe, you can credit, discredits, impeaches Mr. Perry's statement to you about what he saw?
>
> Wouldn't you want to know what Conrad Perry's explanation is? Wouldn't you want to know from Conrad Perry, Why did you tell Detective Kasul just days after the shooting that the man was wearing a mask? Why did you do that?
>
> \*     \*     \*     \*     \*     \*
>
> If what he told you, you can't explain, you can't square with the rest of this case and the rest of the witnesses, including Detective Kasul, look to ... the government. Look to them to explain to you what it is and why it is that we went from mask to no mask. Where is the answer to that? Why doesn't the government want you to know? Isn't it because they don't want you to know the answer?

Although the withholding of evidence by the prosecutor (whether deliberately or inadvertently) until well into trial "put[s] in jeopardy the ... interests which *Brady* is designed to protect," *Edelen v. United States*, 627 A.2d 968, 971 (D.C.1993), appellant cannot reasonably claim an inability to impeach Perry (or Kasul) with the inconsistent statement given the chance he was afforded to do so and the means he instead chose to exploit the non-disclosure.

Appellant's materiality argument, therefore, must rest on the lost opportunity which the trial court did *not* remediate, which was for his counsel to be able to cross-examine the three corroborative eyewitnesses—Holston, Carey, and Beynum—equipped with the fact of Perry's prior statement. With that knowledge casting doubt on the victim's own identification,

---

4. There is, of course, no "difference between exculpatory and impeachment evidence" when it comes to the prosecutor's duty to disclose evidence favorable to the accused. *Kyles*, 514 U.S. at 433, 115 S.Ct. 1555.

appellant argues, he would have questioned those witnesses more aggressively about their claimed ability to see the shooting and whether, in fact, faulty memory—combined with neighborhood rumor and police suggestion—had not caused their identifications [5] rather than a reliable opportunity to observe. Instead, he was limited to adducing what he admits was "[un]clear motivation evidence" (Reply Br. for App. at 4) suggesting that these witnesses had fabricated their identifications. The government, for its part, asserts that appellant was not denied the ability to recall the three witnesses to the stand, pointing out that at the end of the voir dire of Perry and Kasul the court asked appellant's counsel if she "wish[ed] to call any additional witnesses." It further argues that the natural inference from counsel's silence in response is that she saw no more advantage in re-questioning the three women before the jury than in recalling Perry or Kasul to the stand.

We do not resolve the issue of whether the court barred further cross-examination of Holston, Carey, and Beynum. Assuming that it did,[6] we nonetheless do not believe there is a reasonable probability that additional questioning of them in light of Perry's statement would have changed the outcome.[7] Each of the three women had known appellant from school or the neighborhood or through a relative for five years or more. Each testified to having observed his actions before and during the shooting; Carey and Beynum, in particular, saw him walk to a nearly building, open a window, and (Carey implicitly, Beynum explicitly) retrieve a gun, then return and shoot Perry with it. Holston and Beynum then watched as he ran after the victim and fired additional shots. None of the witnesses was shown to have a substantial motive to accuse appellant falsely. And appellant all but concedes the *un* likelihood that, "if questioned, [any of them] would have suddenly admitted that the shooter was masked" (Reply Br. for App. at 5 n. 5). In these circumstances, we believe that he has demonstrated the possibility, but not probability, that more aggressive questioning of the witnesses about whether they could see the shooter's face or recognize him (Holston testified that he "looked [her] in the eye") would have "substantially reduced or destroyed" the reliability of their identifications, when combined with Perry's own. *Kyles,* 514 U.S. at 441, 115 S.Ct. 1555; *see Strickler v. Greene,* 527 U.S. 263, 291, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (stressing difference for purposes of *Brady* materiality between "reasonable *possibility* " and "reasonable *probability* " of a different outcome). Then, too, appellant does not explain how knowledge of Perry's prior statement would have cast significant doubt on April Johnson's testimony that he admitted to the shooting in her presence.[8]

---

5. None of the three witnesses came forward with her identification until some eighteen months after the shooting.

6. Appellant argues, with some record support, that the court's question to counsel entailed a willingness to allow additional voir dire questioning only of witnesses the defense had not cross-examined previously, such as other police witnesses to Perry's prior statements.

7. This case does not require us to revisit the proper standard of review of the trial court's

determination that suppressed evidence would not have materially affected the verdict under *Brady. See Rowland v. United States,* 840 A.2d 664, 687 (D.C.2004) (discussing this court's past decisions on the point). For purposes of this case, we decide the issue *de novo.*

8. Appellant suggests that armed with Perry's statement about the mask he could have shown to the jury that the police were just as cavalier in ignoring Johnson's "initial attestation[] that [she] knew nothing about the of-

This case differs markedly from *Kyles*, on which appellant places heavy reliance, where "[b]ecause the State [had] withheld evidence [until after trial], its case was much stronger, and the defense case much weaker, than the full facts would have suggested." *Kyles*, 514 U.S. at 429, 115 S.Ct. 1555. In *Kyles* the identifications by the government's two key eyewitnesses to the murder "would have been severely undermined by use of their [*own*] suppressed statements" to the police. *Id.* at 444, 115 S.Ct. 1555 (emphasis added); *see also Leka v. Portuondo*, 257 F.3d 89, 106 (2d Cir.2001) (granting habeas relief for *Brady* violation where suppressed testimony of police officer would likely have had "seismic impact" by, *inter alia*, rendering one eyewitness's observations "untenable"). Although Perry's prior statement might have weakened his own identification of appellant (even though he had obvious motive to accuse the right person who had blinded him, and had named appellant as his assailant from the beginning), it can have had no similar effect—as a matter of "reasonable probability"—on the combined identifications by Holston, Carey, and Beynum. Nor is this case like *Banks v. Dretke*, —— U.S. ——, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004), in which the Supreme Court set aside the defendant's state death sentence on *Brady* grounds.[9] There the jury never learned that the witness Farr, whose "testimony was the centerpiece of Banks's prosecution's penalty-phase case," *id.* at 1278, had been a paid informer for the police who specifically had been paid for playing an "instigating role" in the events—Banks's procurement of a gun he allegedly planned to use in further crimes—that allowed the state to argue Banks's continued dangerousness unless he was executed. *Id.* at 1277. The jury likewise did not learn that Farr's involvement with drugs gave him a "continuing interest in obtaining [the investigating police officer's] favor." *Id.* at 1278. "Farr's testimony about Banks's propensity to commit violent acts," the Court stated, was "uncorroborated by any other witness" and so "was crucial to the prosecution," even while the jury was kept "ignoran[t] of Farr's true role in the investigation and trial of the case," as well as of his informer status. *Id.* at 1277, 1279. In the case before us, by contrast, three eyewitnesses in addition to the victim, none of whom had motives to falsify resembling Farr's, identified appellant as the shooter. The likelihood that all four had mistakenly convinced themselves of appellant's identity simply does not impress us as reasonable, and therefore the belated disclosure of Perry's statement does not undermine our confidence in the verdict.

■ Appellant's related argument that the withholding of Perry's prior statement adversely influenced his trial preparation, opening statement, and choice of trial strategy does not yield a different conclusion. Although with earlier knowledge of Perry's statement the defense could have "affirmatively searched for other witnesses who could testify that they saw the shooter with a mask" (Br. for App. at 35),

fense" as they were in ignoring the contradiction in Perry's own account (Reply Br. for App. at 6). But Johnson, while denying from first to last that she had witnessed the shooting, was equally unchanging in her assertions that she indeed knew something about it—she had heard appellant twice confess to shooting Perry because he was "tired of them ... shooting up his car."

9. The Court separately held, under federal habeas law, that a certificate of appealability should have been issued regarding a second *Brady* claim (the "Cook *Brady*" claim") that bore upon the fairness of the guilt determination.

the defense nevertheless already had ample incentive to search for eyewitnesses casting doubt on appellant's identity as the shooter. *See Edelen,* 627 A.2d at 971. And, as in *Edelen,* "although [appellant] was represented by resourceful and conscientious counsel from the Public Defender Service, no motion for a new trial on the basis of newly discovered evidence was ever filed, nor has [appellant] tendered, to the present day, any exculpatory statement from any witness whom he discovered on the basis of the belated *Brady* disclosure[ ]." *Id.* Finally, while late disclosure of favorable evidence certainly has the potential to "throw existing [defense] strategies ... into disarray," *Leka,* 257 F.3d at 101, appellant cannot plausibly argue that knowledge of Perry's statement would have caused him to abstain or shy away from either branch of his attack on the government witnesses—imputing bias to them and questioning their ability to observe the shooting.

### III.

■ Appellant's contention that the trial court deprived him of his Sixth Amendment right to confront the eyewitnesses other than Perry is ultimately not distinguishable from his due process argument under *Brady.* Holston, Carey, and Beynum were each available for full cross-examination at trial regarding their ability to recognize appellant as the shooter. Although knowledge that Perry had initially described his assailant as wearing a mask would have given appellant additional *incentive* to attack their ability to perceive, the absence of that further incentive did not deprive him of a right of confrontation he was otherwise free to exercise completely. *Cf. McCloud v. United States,* 781 A.2d 744, 753 (D.C.2001) (Sixth Amendment may have been violated where trial court precluded "an entire foundation for bias that was relevant and otherwise ad-

missible"). In these circumstances, any error by the trial court in refusing to allow re-opening of cross-examination of the three witnesses is properly analyzed for prejudice under the standard of *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and for the reasons already stated, we do not find the prejudice here sufficient to warrant reversal.

*Affirmed.*