Maurice SYKES, Appellant,

v.

UNITED STATES, Appellee.

Nos. 97–CF–1898, 99–CO–785, 99–CO–1528 and 01–CO–1407.

District of Columbia Court of Appeals.

Argued April 20, 2004.
Decided March 9, 2006.

Bruce A. Johnson, Jr., appointed by the court, for appellant.

Rozella A. Oliver, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Elizabeth Trosman, Assistant United States Attorney, were on the brief, for appellee.

Before FARRELL, REID and GLICKMAN, Associate Judges.

REID, Associate Judge:

Appellant Maurice Sykes was tried in 1997, along with two other persons, for attempted armed robbery and for the murder of Evgeny Mihailov, as well as other charged crimes.[1] The jury found him guilty of two counts of attempt to commit robbery while armed, first-degree felony murder while armed, possession of a firearm during the commission of a crime of violence or dangerous offense, and carrying a pistol without a license. He lodged several post-conviction motions in the trial court related to allegations of ineffective assistance of counsel, all of which were denied. He filed timely appeals from the judgments of the trial court.

We reach only one of the issues raised by Mr. Sykes—that relating to an alleged *Brady*[2] violation. We conclude that the government's late disclosure of *Brady* information, and the consequent inability of the government or the defense to locate two potential defense witnesses who had given grand jury testimony that was favorable and potentially exculpatory, impinged on Mr. Sykes' constitutional due process right to a fair opportunity to defend himself. Furthermore, on the record in this case, we hold that there was a reasonable probability that the outcome would have been different had the defense been able to present at trial one or both of the witnesses whose grand jury testimony rebutted that of a key government witness. Therefore, we reverse the judgment of the trial court and remand this case for a new trial.

---

1. All three men were indicted on the following charges: one count of conspiracy to commit armed robbery (dismissed by the government before trial); two counts of attempt to commit robbery while armed, in violation of D.C.Code §§ 22–2901, –3202 (1981), recodified at D.C.Code §§ 22–2801, –4502 (2001); two counts of first-degree felony murder while armed, in violation of §§ 22–2401, –3802, recodified at §§ 22–2101, –3202; one count of first-degree premeditated murder while armed (dismissed as to Mr. Sykes and one of his codefendants); one count of possession of a firearm during a crime of violence, in violation of § 22–3204(b), recodified at § 22–4504(b); and one count of carrying a pistol without a license, in violation of § 22–3204(a), recodified at 22–4504(a).

2. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## FACTUAL SUMMARY

The government presented evidence showing that on the night of October 23, 1995, three young men were sitting on the outside front steps of the Bulgarian Embassy at the corner of 22nd and R Streets, in the Northwest quadrant of the District of Columbia. While sitting there, they saw a gold or orange colored car drive by, and later heard Paniot Ignatiev, who had been struck in the head and beaten by two assailants, calling for help. One of the assailants turned to the young men sitting on the steps and demanded money; he had a gun. Evgeny Mihailov offered a couple of dollars to the assailant. The assailant grabbed his arm and directed Mr. Mihailov to give him his leather jacket. Convinced that the gun was not loaded, Mr. Mihailov moved to take it away from the assailant, but he was shot. As he ran toward the embassy, he was shot again and later succumbed to his wounds. The two assailants ran away.

Two other government witnesses, Jordan Petkov and Mary Sherman Willis, both saw a gold colored vehicle that night. Mr. Petkov noticed two men, one wearing a long, black jacket, running toward the vehicle and getting into it; the vehicle was driven away at a high rate of speed. Ms. Willis, who lived close to the Bulgarian Embassy, heard two gunshots, looked out of her window, watched as two men ran up to an old, gold car and got into the back seat.

Mr. Ignatiev maintained that he got a "very good look" at his assailant, whom he described as shorter than the other man, 20–30 years old, with "large characteristic eyes." Neither he nor Velio Kitanov,[3] who had been sitting on the embassy steps with Mr. Mihailov, identified anyone from a "showup" presentation on the evening of the murder. The showup did not include Mr. Sykes or his co-defendants, Gary Washington and Shon Hancock.

On the same night, in the Washington suburb of Capitol Heights, Maryland, Ralph Williams, a government informant (he was paid and received other benefits for information given to the police), was gambling, playing cards at a boarding house with Wayne Sellers and Tony Parrott. He testified that Mr. Washington, Mr. Sykes, and Mr. Hancock appeared at the boarding house around 10:45 p.m. on the night of the attempted robbery and the shooting. Mr. Washington, who was wearing a three-quarter length black leather jacket, began to describe beating up an older guy and "bust[ing]" someone "over a jacket." According to Mr. Williams, Mr. Washington said that as the person "tried to make it into a door, and a buzzer went off, ... he just shot him." Mr. Sykes "was saying that he was beating this guy up for a watch, an older guy." Mr. Sykes demonstrated by "shadow boxing." Mr. Hancock declared that he was in the vehicle used to transport Mr. Washington away from the scene of the crime. Messrs. Williams, Sellers and Parrott tried on Mr. Washington's leather jacket, which he wanted to sell. Mr. Williams discovered a rusty .38 revolver in the inside jacket pocket.

Mr. Williams did not initially report the alleged encounter with Mr. Washington and Mr. Hancock at the boardinghouse. When he heard about the embassy murder, however, he inquired of a DEA agent to whom he previously had provided information, whether there was a reward for information. The DEA agent told him to contact a Metropolitan Police Department ("MPD") officer, Sergeant Joseph McCann. Mr. Williams relayed his infor-

---

**3.** Mr. Kitanov described the perpetrators as a taller, dark male wearing a dark, knee-length leather jacket and holding a gun, and a shorter, dark-skinned male.

mation about the boarding house incident to Sgt. McCann.

Both direct and cross-examination revealed that Mr. Williams had prior drug convictions, including a 1994 conviction for conspiracy to possess cocaine with intent to distribute, and a 1994 conviction for possession of cocaine. He was charged in January 1995 with possession of cocaine with intent to distribute, which was still pending in October 1995. Although he later entered a guilty plea to that charge, he had not been sentenced at the time of his trial testimony. He acknowledged that he had been a drug dealer between 1989 and 1992, and could earn "between 6 and $7,000 a week on a good week." He indicated that he was paid $2,100 by the government "for relocation." He still lived in the Capitol Heights neighborhood at the time of trial, but said that he was "in the process of moving."

When the two young men who were sitting on the embassy steps with the decedent were shown a photo array four days after the murder, which included a picture of Mr. Washington, they were unable to identify anyone as an assailant on the night of Mr. Mihailov's murder. When Mr. Kitanov was taken to the area where a gold-colored car was parked in late October 1995, he did not recognize it as the one he saw the night of the murder, but the person he believed shot the decedent was sitting in a car. Mr. Sykes was arrested in Capitol Heights, Maryland on November 2, 1995. Mr. Washington and Mr. Hancock were spotted a couple of days later in a gold-colored car, with one other person, and they were arrested.

Two lineups were assembled on December 14, 1995. Mr. Washington was in the first and Mr. Sykes in the second lineup. Mr. Kitanov identified Mr. Washington right away, but picked someone other than Mr. Sykes from the second lineup. Neither Peter Enchev, the other young man who was sitting on the steps of the embassy at the time of the murder, nor Ms. Willis, was able to identify Mr. Washington or Mr. Sykes from the lineups. Mr. Ignatiev did not identify Mr. Washington, but chose Mr. Sykes from the second lineup, saying he was "absolutely sure" that Mr. Sykes was his assailant.

Mr. Sykes presented an alibi defense. His brother and sister, Michael Sykes and Michelle McCoy, testified that their great grandmother died in North Carolina on October 21, 1995. All three left for North Carolina around 3 p.m., arriving around 7 p.m., on October 23 to attend their grandmother's funeral on October 25.[4] They stayed with their parents in their trailer, and did not return to the District before the funeral.

## ANALYSIS

Mr. Sykes argues, in essence, that his constitutional right to present witnesses in his defense was impaired because the government violated *Brady, supra,* note 2, by deliberately not revealing, until two days prior to his trial, the grand jury testimony of Wayne Sellers and Tony Parrott, which refuted the testimony of government witness Ralph Williams. Neither Mr. Sellers nor Mr. Parrott could be located after the government disclosed that they had testified before the grand jury. The testimony had been presented over a year before trial, but the government did not mention it until two days before trial. Consequently, Mr. Sykes argues that the trial court should have granted his request to "exclude[ ] the testimony of Ralph Williams." Because Mr. Williams' testimony was not excluded, Mr. Sykes main-

4. Ms. McCoy was shown the program pertaining to her great grandmother's demise to re-
fresh her recollection that the date of the funeral was October 25th.

tains that he was "denied due process of law" and "deprived ... from presenting a complete defense." The government asserts that "[b]ecause Mr. Sykes could and did use [the] *Brady* information at trial, and used it effectively, his arguments are without merit." In addition, the government contends that "despite its late disclosure, the *Brady* information was disclosed before opening statements were delivered and, thus, appellant was able to factor this information into his trial strategy." The government maintains that "the tardy disclosure of this information did not undermine appellant's alibi theory," and that "[the trial court's] offer of a continuance to help remedy the late disclosure was declined by appellant."

We begin first with the factual context for the analysis of the *Brady* issue. On May 2, 1996, Mr. Parrott and Mr. Sellers testified before the grand jury. Mr. Parrott told the grand jury on May 2, 1996, that he had attended high school with Mr. Washington, Mr. Sykes, and Mr. Hancock in Capitol Heights, Maryland, and grew up with the three men. He was not at the boarding house in Capitol Heights on the night of October 23, 1995. He denied that Mr. Sykes, or Mr. Washington, or Mr. Hancock had told him anything about a shooting in the District of Columbia on October 23, 1995. He never saw Mr. Washington with a gun, and thought that Mr. Hancock had a big, rust-colored, old car. He had not spoken with Mr. Sykes "in years" but had talked with Mr. Williams the day before appearing for his grand jury testimony. He stated that he was with his girlfriend on the night of the shooting and attended a movie. The prosecutor asked what movie he saw "on the night of the 24th (sic) with [his] girlfriend," one of the jurors asked him what movie he went to on the 23rd, and another inquired about whether his girlfriend paid for the movie he attended "on the 23rd of March (sic)." He replied that the movie was Sud-

den Death and his girlfriend paid for the tickets, but expressed some uncertainty. When another juror asserted: "So for the record, you have testified that you are not sure that you were at the movies on October 23rd," Mr. Parrott said: "I was at— I'm not sure, I don't know the exact date, but I was at the movies. I went to see Sudden Death in October." He steadfastly maintained that he was not at the boarding house on October 23.

At the time of his testimony before the grand jury, Mr. Sellers had known Messrs. Washington, Hancock and Sykes for a number of years. He heard about the murder at the Bulgarian Embassy in the newspapers. He acknowledged buying a long, black leather coat from Mr. Washington at the boarding house, but did not remember when he bought it. Both Mr. Parrott and Mr. Washington were present when he bought the coat, but not Mr. Sykes. He claimed that he gave the coat to a homeless man about two weeks after he bought it. He did not hear anything about the murder from Messrs. Sykes, Hancock or Washington. He did not remember where he was on the night of October 23.

Approximately six days after Mr. Parrott's and Mr. Sellers' appearance before the grand jury, Messrs. Washington, Sykes and Hancock were indicted. Their jury trial commenced on April 9, 1997. On April 7, 1997, the government served on defense counsel a letter indicating, in essence, that it would use the testimony of a confidential informant (Mr. Williams) to establish statements made by Mr. Washington on the night of the shooting, in the presence of Mr. Sykes. The government declared that these statements by Mr. Washington constituted adoptive admissions by Mr. Sykes. The government also advised in the letter that Mr. Parrott and Mr. Sellers were present at

the time Mr. Washington made his statements, that both had testified before the grand jury; and that both insisted they were not present when Mr. Washington made the statements. Counsel for Mr. Sykes complained that the information "should have been turned over earlier," and that this was "critical information" which might be used as a basis for a judgment of acquittal motion. Counsel "asked for Mr. Sykes' release until [he could] have Mr. Parrott placed under subpoena and made available as a witness in this case." The government acknowledged that the information in its letter "obviously fit[ ] within the *Giglio*[5]/post-*Brady* line of cases," but expressed the view that it was not "exculpatory *Brady*"; rather, "it's the type of evidence that is impeaching of ... the confidential informant." The government stated that "[t]he sole reason ... [for not] turn[ing] this information over [earlier] has been ... an effort to protect the identity and safety and security of the confidential informant." When the trial judge pointed out that the government could have placed Mr. Parrott under subpoena, the government stated that it had "tried to do" so, but that Mr. Parrott "deals drugs and he's evading everybody."

As the discussion proceeded, the underlying assumption, based on the government's indication that Mr. Sellers was within the judicial system and had been placed under a writ, was that Mr. Sellers would be available for trial. Thus, the discussion between the trial court and both counsel centered on how to find Mr. Parrott. The prosecutor announced that detectives were trying to locate Mr. Parrott and would "continue to seek to contact" him. The prosecutor provided two addresses where she thought Mr. Parrott could be found. Counsel for Mr. Sykes stated that he had "already called [his]

investigator to begin looking for [Mr. Parrott] at the addresses that [the prosecutor] provided." Based on the prosecutor's representations, the trial judge did not order the government to turn over the grand jury testimony of either Mr. Sellers or Mr. Parrott on April 7, 1997. Counsel for Mr. Washington and Mr. Hancock asked for a dismissal, which the trial court did not grant. Counsel for Mr. Sykes requested twenty-four hours in which to try to find Mr. Parrott, as did counsel for Mr. Washington.

The trial judge ruled that if a witness is available, "all the government need do is make the witness available and need not make available any prior statements that that person made. Once that person is made available, I think they have fulfilled their *Brady* obligations." If the witness is not available, the ruling would be the same, "until such time as it's clear that the witness is not going to be available for live testimony." If the witness does not become available, then the transcript would have to be handed over to the defense. The trial court also ruled that the evidence, based on Mr. Williams' testimony, could be admitted under the government's adoptive admissions theory.

On April 9, 1997, the first day of trial, the prosecutor announced that Mr. Parrott was not under subpoena, that the government was still looking for him, and that the government was prepared to turn the grand jury transcript over to defense counsel. Counsel for Mr. Sykes had not been able to locate Mr. Parrott, and therefore, requested Mr. Parrott's grand jury testimony. Counsel for Mr. Washington informed the court that his investigator could not find Mr. Parrott at the two addresses provided by the government, and renewed his "motion to dismiss and to strike the testimony of the CI [confidential

---

**5.** *Giglio v. United States,* 405 U.S. 150, 92    S.Ct. 763, 31 L.Ed.2d 104 (1972).

informant]," Mr. Williams. Counsel for Mr. Hancock chimed in, stating that her investigator could not locate Mr. Parrott. The trial court offered to continue the case to "give counsel further opportunity to ... locate" Mr. Parrott because "his name should have been produced at an earlier point or some other steps [should] have been taken by the government to make sure that he was available." The court further announced that it was not "prepared to dismiss the case or to strike the confidential informant's testimony based upon the unavailability of the witness," because "those are extreme remedies in a very serious case and ... [are not] appropriate." Nor was it appropriate to release the defendants in light of the charges against them. Counsel for Mr. Sykes rejected the trial court's offer of a continuance, in part, because it did not allow for the release of Mr. Sykes. Counsel also stressed that Mr. Sykes was "in this bind because the government failed to produce [the information] earlier and therefore [Mr. Sykes'] remedy should flow from the government." Counsel for Mr. Sykes also noted that "the other witness [Mr. Sellers] ... could be called [a] *Brady* witness" and "was under a government writ to be" present. Counsel then said, "I'm prepared to go forward today." The government said it would turn over to the defense the transcript containing Mr. Parrott's testimony and would continue to look for him. Counsel for Mr. Sykes related his understanding that "the other witness," Mr. Sellers, "is under government writ to be here," and asked for confirmation from the government. The prosecutor responded, "That's correct."

After the parties read the grand jury transcript of Mr. Parrott, their attention turned to the task of determining which parts of his transcript should be admitted into evidence. Counsel for Mr. Sykes said: "I want the record to be clear I'm not waiving my original position, which was

that the government should have had Mr. Parrott available or here for us."

The trial proceeded under the assumption that Mr. Sellers would be available to be called as a witness. On April 23, 1997, however, and about two weeks into the trial, the prosecutor revealed that Mr. Sellers could not be located. The prosecutor stated that she had "advised the defense [on April 7, 1997] that Wayne Sellers was in Hagerstown[, Maryland] and that [the government was] applying for a writ to secure his presence ... for trial." After Mr. Sellers had been transferred to the D.C. Jail as a result of the writ, the government had planned to interview him, "and to serve a subpoena on him," but the government "learned [on April 22, 1997,] for the first time that the marshals in the D.C. Jail had released him on [the] past Saturday following notification from Hagerstown that he had in fact reached his release date." The writ had been quashed and neither the government nor the court had been informed. Counsel for Mr. Hancock remarked that the government had given assurances that it "had effected a writ and done whatever you have to do to get a writ." When counsel for Mr. Hancock asked that Mr. Sellers' grand jury testimony be turned over, the government "suggest[ed] we wait a couple of days to see if we can find him," but did not object to turning over the transcript. Counsel for Mr. Sykes objected to waiting a couple of days for the transcript. The government agreed to turn the transcript of Mr. Sellers' testimony over to the defense.

By April 29, 1997, Mr. Sellers had not been located, and the case was ready for closing arguments. The government pointed out that it had "had detectives going almost daily for the last month to the family homes," and that "not only have the witnesses been unavailable, but at least in Mr. Sellers' case, the family vacated the

premises." When the trial court asked what the defense had done to locate Mr. Parrott and Mr. Sellers, counsel for Mr. Sykes replied that the defense had tried to find Mr. Sellers before learning that the government was "writing him back" to the District, and that since "the writ had been lodged," there was "nothing more he could do to ensure [Mr. Sellers'] appearance [at trial]." When counsel learned that Mr. Sellers had been released, he "immediately dispatched [his] investigator to the ... address" provided by the government. The investigator "waited and waited" and "returned to the house, found someone home. They said Mr. Sellers didn't live there, and [the investigator] checked the following day." Counsel also advised that "[w]ith respect to Mr. Parrott, [his] investigators checked ten or eleven times at various addresses and got all negative responses on all of those." He added that he had "exhausted all [his] investigative resources to try to find these people." Counsel for Mr. Hancock and for Mr. Washington told the trial court what they had done to locate Mr. Parrott and Mr. Sellers.

In response to the stated efforts of the government and defense counsel to track down Mr. Parrott and Mr. Sellers, the trial court declared:

> It seems to me that what has been presented shows that the defense did what they could do with the limited time that they had, although it has been some time now. And, I think indicative of the difficulty of finding these two people is the fact that the government has been also in the process of trying to find them and can't find them. And, I think.I have no other alternative other than to conclude that the witnesses are in fact unavailable to the defense.

The parties then spent time determining what parts of the grand jury testimony would be admitted into evidence, and limited portions of the grand jury testimony of Mr. Parrott and Mr. Sellers were read to the jury. Essentially, the portions read indicated that Mr. Parrott and Mr. Sellers did not hear Messers. Washington, Sykes and Hancock discuss the Bulgarian Embassy murder on October 23, 1995. On the afternoon of April 29, 1997, closing arguments took place.

We turn now to the applicable legal principles. A defendant has a constitutional right to present a defense, and is entitled to "a fair opportunity to defend against the [government's] accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *see also Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). The Supreme Court of the United States has emphasized that, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers*[, *supra*], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, *Washington*[, *supra*, 388 U.S. at 23, 87 S.Ct. 1920], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (other citations omitted). "The right to offer the testimony of witnesses and to compel their attendance, if necessary, is in plain terms the right to present a defense ... [and] a fundamental element of due process of law." *Castellon v. United States*, 864 A.2d 141, 159–60 (D.C.2004) (citing *Bassil v. United States*, 517 A.2d 714, 716 (D.C. 1986)) (quoting *Washington*, *supra*, 388 U.S. at 18, 87 S.Ct. 1920) (internal quotation marks omitted).

Under *Brady*, *supra*, "[t]he suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith

or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. "[I]t is now well settled that the prosecution must disclose exculpatory material at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case . . . ." *Edelen v. United States*, 627 A.2d 968, 970 (D.C. 1993) (citation and internal quotation marks omitted). In addition to exculpatory material, "[t]he government is required to disclose evidence . . . that affects the credibility of a government witness where material to guilt or punishment." *Ebron v. United States*, 838 A.2d 1140, 1155 (D.C. 2003) (citing *Brady, supra*, 373 U.S. at 87, 83 S.Ct. 1194; *Giglio, supra*, note 5, 405 U.S. at 154–55, 92 S.Ct. 763); *see also Moore v. United States*, 846 A.2d 302, 305 n. 4 (D.C.2004) ("There is, of course, no 'difference between exculpatory and impeachment evidence' when it comes to the prosecutor's duty to disclose evidence favorable to the accused") (citing *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Moreover, " 'a prosecutor's timely disclosure obligation with respect to *Brady* material can never be overemphasized,' and the practice of delayed production must be disapproved and discouraged." *Curry v. United States*, 658 A.2d 193, 197 (D.C.1995) (citation omitted). "Reversal will not be ordered on the grounds of failure to disclose under *Brady* 'absent a further showing that disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.' " *Ebron, supra*, 838 A.2d at 1155 (quoting *Farley v. United States*, 694 A.2d 887, 889 (D.C.1997) (quoting *Kyles, supra*, 514 U.S. at 441, 115 S.Ct. 1555)). " 'Reasonable probability,' in this context, means 'a probability sufficient to undermine confidence in the outcome.' " *Id.* (citing *Farley, supra*, (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985))) (other internal quotation marks omitted).

Here the government does not dispute that the testimony of Mr. Sellers and Mr. Parrott before the grand jury was favorable to Mr. Sykes in that it undermined the government's critical witness against Mr. Sykes. Mr. Williams testified that he heard Mr. Sykes discuss the Bulgarian embassy crimes on the night on which they occurred. Mr. Williams was gambling, playing cards with Mr. Sellers and Mr. Parrott at a boarding house in Capitol Heights, Maryland. According to Mr. Williams, Mr. Sykes and his two co-defendants, Mr. Washington and Mr. Hancock, arrived at the boarding house around 11 p.m. When asked whether Mr. Sykes said anything that night, Mr. Williams stated: "Maurice was saying that he was beating this guy up for a watch, an older guy." Mr. Washington was wearing "a black leather jacket . . . about three-quarters" in length and Mr. Sykes "had on black jeans." On redirect examination, Mr. Williams again was asked, "[w]hat did Mr. Sykes say he had done?" Mr. Williams replied: "Maurice said he had punched an old man in the face, trying to get his Rolex off his hand. He said a gold watch which he thought was a Rolex."

■ The grand jury testimony of both Mr. Sellers and Mr. Parrott shows that they denied hearing a discussion of the Bulgarian Embassy events at the Capitol Heights boarding house on the evening of the crimes, where Mr. Sykes and his co-defendants allegedly were present. Mr. Parrott's grand jury testimony stated that Mr. Sykes and his co-defendants were not at the boarding house on the night of the murder at the Bulgarian Embassy, and therefore the statements attributed to the three men by Mr. Williams, a key government witness, against Mr. Sykes, could not be true. Mr. Parrott's grand jury testimony not only contradicted the adoptive admissions introduced into evidence against Mr. Sykes, but also showed that Mr. Sykes

could not have told Mr. Williams at the boarding house that he punched Mr. Ignatiev and tried to take his Rolex watch. And, although in his grand jury testimony Mr. Sellers placed Mr. Washington at the boarding house at some later time when he bought Mr. Washington's leather jacket, he said that Mr. Sykes was not present on that occasion. Therefore, his account did not confirm Mr. Williams' testimony that Messrs. Washington, Sykes and Hancock had discussed the assault or shooting that occurred on October 23, 1995. Hence, under our precedents, *see Moore; Ebron, supra,* the grand jury testimony of Mr. Parrott and Mr. Sellers should have been disclosed to the defense at an earlier point in time, whether it was considered to be potentially exculpatory information or favorable impeaching evidence. "The refusal by the prosecution to disclose material evidence favorable to the defense deprives the defendant of his liberty without due process of law." *Edelen, supra,* 627 A.2d at 970 (citing *Brady, supra,* 373 U.S. at 87, 83 S.Ct. 1194).

The testimony of Mr. Parrott and Mr. Sellers was taken in May 1996, and the government had ample time after the indictment of Mr. Sykes and his codefendants, also in May 1996, to locate a safe place for Mr. Williams, or to place Mr. Parrott under subpoena. It did neither. In fact, at the time of his trial testimony in 1997, Mr. Williams admitted that he still lived in the Capitol Heights neighborhood, although he was in the process of moving out. In addition, an affidavit from defense counsel's investigator shows that as late as April 18 or 19, 1997, Mr. Sellers was incarcerated or detained in Upper Marlboro or Hagerstown, Maryland, but was released on April 19. Mr. Sykes' supplemental brief also indicates that the prosecutor announced on April 23, 1997, that she "had applied for a writ to have [Mr. Sellers] brought to [the District]," but that the Marshals in the District "had released him days earlier following notification from Hagerstown that [Mr. Sellers] had in fact reached his release date, albeit six months early." The government in its main appellate brief indicates that on "the tenth day of trial, the government informed the court and defendants that Mr. Sellers, who had been moved to the D.C. Jail pursuant to a government writ, had accidentally been released from jail the prior weekend." The April 23, 1997, transcript shows that the government learned of Mr. Sellers' release from jail on April 22, 1997, before the government had interviewed him. Had the government apprised the defense about the Parrott/Sellers' testimony shortly after their May 2, 1996, grand jury appearance, they would have had the opportunity to speak with both men long before the commencement of appellant's trial on April 9, 1997. Instead, Mr. Sykes did not obtain the transcript of Mr. Parrott's testimony until April 9, 1997, and that of Mr. Sellers until April 23, 1997, about two weeks after trial had begun. As we said in *Moore, supra,* "the withholding of evidence by the prosecutor (whether deliberately or inadvertently) until well into trial 'puts in jeopardy the ... interests which *Brady* is designed to protect.'" *Id.* at 305 (quoting *Edelen, supra,* 627 A.2d at 971).[6]

---

**6.** The government relies mainly on *Curry, supra,* but, unlike the case before us, in *Curry,* "the judge found that [the witness in question] probably would not have been located even if the defense had learned of his statement at or about the time the indictment was returned." *Id.* at 198. At the time Mr. Sykes and his codefendants were indicted in this case, the government undoubtedly knew where to find both Mr. Parrott and Mr. Sellers since they had testified before the grand jury a few days earlier. Indeed, Mr. Sellers was in the criminal justice system, and had been brought to and remained in the D.C. jail until April 19, 1997, after Mr. Sykes' trial had begun.

The remaining question is whether we must reverse Mr. Sykes' convictions under the circumstances of this case. Reversal is required where there is a reasonable probability that the outcome of the case would have been different, or "a probability sufficient to undermine confidence in the outcome," *Ebron, supra*, 838 A.2d at 1155. Put another way, our task is to ascertain whether there is a reasonable probability that the live testimony of either Mr. Parrott or Mr. Sellers, or both, would have altered the result with respect to Mr. Sykes. Although Mr. Ignatiev testified that he was "absolutely sure" that Mr. Sykes was the man who tried to rob him, other witnesses, Mr. Kitanov, Mr. Enchev, and Ms. Willis, failed to pick Mr. Sykes out of a December 14, 1995, lineup, and Mr. Kitanov identified someone else from the lineup as Mr. Ignatiev's assailant. Thus, Mr. Williams' testimony was pivotal to the government's case, but he was already a vulnerable witness. He did not immediately report the alleged boarding house statements of Mr. Sykes and Mr. Washington to law enforcement authorities; he asked his DEA contact whether there was a reward for information relating to the murder at the Bulgarian Embassy; and he was a paid government informant. We conclude that if Mr. Parrott or Mr. Sellers, or both, had testified in person before the jury that he was, or they were, present at the boarding house on the night of October 23, 1995, but that Mr. Sykes was not, and that neither had heard Mr. Washington recount the alleged events of October 23 in the presence of Mr. Sykes or Mr. Hancock, there is a reasonable probability that the jury would have viewed Mr. Williams' testimony in a different light and as significantly less probative. Conversely, without the in-person testimony of either witness, the government was able to emphasize its theory of adoptive admissions, through the testimony of Mr. Williams, to the extent that the alleged self-incriminating statements of Mr. Washington at the boarding house were considered adopted by Mr. Sykes. The government, of course, would have had an opportunity to cross-examine Mr. Parrott and Mr. Sellers, and to get the benefit of impeaching material reflected in the grand jury transcripts, something the prosecutor could not do here because the trial court pared to a minimum what could come in from the grand jury testimony. But, in contrast to the government's lost opportunity, as the trial unfolded, it was Mr. Sykes' constitutional right to present a complete defense that was infringed.

That the government relied heavily on the testimony of Mr. Williams is clear from the record before us. In her closing argument to the jury, the prosecutor highlighted Mr. Williams' testimony in detail. And in its closing rebuttal, partially in response to the closing arguments of defense counsel, the prosecutor began by focusing on Mr. Williams, Mr. Sellers and Mr. Parrott:

> Is Ralph Williams a liar, a deceiver, a bought and paid for witness as the defense counsel have all suggested to you, not just suggested but said to you? Or is Ralph Williams a hero? Ladies and gentlemen, we can't solve murders in the District of Columbia if people--

> Defense Counsel for Mr. Washington: Objection, Your Honor.

> The Court: Overruled

> The Prosecutor: -- who have information about them do not come forward. And we can't solve murders if people like Wayne Sellers and Tony Parrott tell us I didn't see nothing and I didn't hear nothing . . . .

Without the live appearance of Mr. Parrott and Mr. Sellers at trial and an opportunity for the jury to observe their demeanor and to make a credibility determination, the prosecutor was able to suggest that they were not being truthful before the grand jury when they claimed not to have heard

the appellants discuss the events at the Bulgarian Embassy on the night of Mr. Mihailov's murder, and by contrast, the prosecutor was able to depict Mr. Williams in a favorable light by suggesting that he was a hero because he came forth to help the police solve a murder. In fact, the prosecutor continued to emphasize Mr. Williams' testimony (her rebuttal argument regarding Mr. Williams covered several transcript pages). She ended her rebuttal by dismissing facts about Mr. Williams which the defense had used to impeach his credibility:

> And Ralph Williams, even if he had been given a million dollar[s], there's no evidence that he was, and even if the government had gotten him out from some kind of death penalty, which didn't happen, there's no way Ralph Williams could have made up those details because no one told him anything about what happened, anything about specific things that happened at the embassy except the individual -- the individual statements of Gary Washington and Maurice Sykes and Shon Hancock.

> And if Ralph Williams expects maybe he's going to get a break on his sentence, is that unreasonable? Is that unreasonable for him to believe? Would that be an unreasonable thing to happen? You may not like -- some people may not like the fact that sometimes people who commit crimes get a break because they gave information to the police. But as I mentioned before, sometimes that's the only way to solve a murder. And, ladies and gentlemen, I submit to you this case has been solved.

Immediately after the prosecutor's rebuttal, the trial judge instructed the jury. The judge told the jury, in part, that it "should consider ... whether what Ralph Williams received from the government ... has motivated him to testify falsely against the defendants in order to further his own interests," but that with respect to

statements relayed by Mr. Williams about the defendants, the jury could:

> Use ... any statements allegedly made by Maurice Sykes against Maurice Sykes if [it] conclude[d] that the statements were made and that Ralph Williams heard those statements.

> In addition, if [the jury] conclude[d] that Ralph Williams heard either Gary Washington or Maurice Sykes make statements about the events at issue in this case, [it could] use statements by Gary Washington against Maurice Sykes and ... statements made by Maurice Sykes against Gary Washington [under circumstances specified by the trial judge].

On this record, then, we cannot agree with the government that reversal is not warranted with respect to Mr. Sykes' *Brady* claim. "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane, supra,* 476 U.S. at 690, 106 S.Ct. 2142 (citation omitted). This is "a fundamental element of due process of law." *Castellon, supra,* 864 A.2d at 160 (citation omitted). The government's very tardy disclosure of Mr. Parrott's and Mr. Sellers' grand jury appearance, approximately one year after that testimony, not only constituted a *Brady* violation, but also deprived the defense, pre-trial, of information that was potentially exculpatory, and favorable at least because of its potential negative impact on the testimony of a key government witness, Mr. Williams. But the government maintains that "[b]ecause Mr. Sykes could and did use [the] *Brady* information at trial, and used it effectively, his arguments are without merit." While Mr. Sykes had an opportunity to conduct rigorous cross-examination of Mr. Williams, he had no opportunity to present Mr. Sellers or Mr. Parrott, or both, to the jury. Hence, their credibility was not tested by direct or cross-examination, and the prosecutor was able to cast doubt on their credi-

bility by suggesting that they were not being truthful in saying that they did not hear the appellants discuss the October 23, 1995 events at the Bulgarian Embassy. And, the substantially redacted grand jury testimony of Mr. Sellers and Mr. Parrott, which the jury heard, did not provide a complete picture of them, or afford the jury the opportunity to see their demeanor.

 The government contends that "despite its late disclosure, the *Brady* information was disclosed before opening statements were delivered and, thus, appellant was able to factor this information into his trial strategy." How the government expected Mr. Sykes to factor "this information into his trial strategy," is not clear, especially since the defense was under the assumption until well into the trial, shared by the government, that at least Mr. Sellers would be available to testify. The government also points out that the trial court's "offer of a continuance to help remedy the late disclosure was declined by the appellant." By April 7, 1997, when the government finally disclosed the fact of Mr. Parrott's and Mr. Sellers' grand jury appearance, Mr. Parrott could not be located, but the government informed the appellants and the trial court that it was looking for Mr. Parrott and had Mr. Sellers under a government writ so that he would be available for trial. Hence, at that point, it was reasonable for counsel for Mr. Sykes to request twenty-four hours in which to try to find Mr. Parrott, rather than asking for a mistrial or a continuance. On April 9, 1997, when it became apparent that none of the parties, the government and defense counsel alike, could locate Mr. Parrott, Mr. Sykes still was under the impression that Mr. Sellers would be available to testify at trial, and indeed asked the prosecutor to confirm

that Mr. Sellers "is under government writ to be here." The prosecutor replied, "That's correct." Hence, in light of his belief that Mr. Sellers would be available, and given the length of time Mr. Sykes had been incarcerated while awaiting trial, it was reasonable for counsel to reject the trial court's offer of a continuance to provide an additional opportunity to the defense to locate Mr. Parrott. In any case, even by April 29—when the case was ready for closing arguments—Mr. Sellers still had not been located. Had the government put Mr. Parrott and Mr. Sellers under subpoena, or revealed their identities to the defense shortly after their 1996 grand jury appearance, they would have been available to Mr. Sykes as potential *defense witnesses. In addition, Mr.* Sykes would have had an opportunity to interview them, and to conduct additional pretrial investigation in aid of his defense, based upon those interviews.

In sum, on the record in this case, we are constrained to hold that there is a "reasonable probability," not just a "reasonable possibility," *see Moore, supra,* 846 A.2d at 306 (citing *Strickler v. Greene,* 527 U.S. 263, 291, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)), that the outcome of Mr. Sykes' trial would have been different had the defense been able to present at trial one or both of the witnesses whose grand jury testimony contradicted Mr. Williams' trial testimony.

■ Accordingly, for the foregoing reasons, we reverse the judgment of the trial court and remand this case for a new trial.[7]

*So ordered.*

---

mand the case for a new trial because we are

satisfied that, if believed, there was sufficient evidence, based on the testimony of Mr. Ignatiev, Mr. Petkov, and Ms. Willis, for example, on which reasonable jurors could have found Mr. Sykes guilty beyond a reasonable doubt.