**Darryl J. SMITH, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 91–CF–1232, 93–CO–1573.**

District of Columbia Court of Appeals.

Argued Feb. 28, 1995.

Decided Oct. 12, 1995.

We therefore remand the case so that the trial court may examine the transcript *in camera* to determine whether it contains exculpatory evidence.[3]

Stephen F. Brennwald, Takoma Park, MD, appointed by the court, for appellant.

Diana M. Harris, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas C. Black, and G. Paul Howes, Assistant United States Attorneys, Washington, DC, were on the brief, for appellee.

Before TERRY and RUIZ, Associate Judges, and MACK, Senior Judge.

TERRY, Associate Judge:

Appellant was convicted of distributing cocaine, D.C.Code § 33–541(a)(1) (1993), and first-degree murder (felony murder) while armed, D.C.Code §§ 22–2401, 22–3202 (1989).[1] On appeal from the judgment of conviction, he contends that the trial court erred in failing to declare a mistrial when one of the government's witnesses said that appellant "always wore a bullet-proof vest," in allowing a witness to testify that appellant told a juvenile to "watch the strip," and in refusing to review *in camera* a certain transcript that defense counsel believed might contain *Brady* material.[2] We reject the first two arguments. However, we hold that the trial court abused its discretion by failing to review the transcript for potential *Brady* material after the government acknowledged that portions of a witness' testimony in the transcript were inconsistent with the testimony of other witnesses at appellant's trial.

I

On the night of July 31, 1988, appellant and two friends, Lamar Young and Dominic Dorsey, were in the area of 59th and Blaine Streets, N.E. At about midnight appellant handed a .32 caliber pistol and about ten $20 rocks of crack cocaine to a fourteen-year-old juvenile, whom we shall call "D.J.," and told him to "watch the strip." Appellant and his two companions then drove away in Dorsey's car. After they had returned to the area, sometime around 3:00 a.m., a black Nissan Maxima driven by Marvin Alston pulled up and stopped near the corner of 59th and Blaine Streets. Tony Morgan, who was there selling narcotics, recognized Alston as one of his regular customers and started across the street to sell him some cocaine. Appellant, however, called him back and told D.J. to "serve the man and get the car." When Morgan protested that Alston was one of his regular customers, appellant merely replied that he "wanted the car."

D.J. headed across the street toward Alston with cocaine in one hand and a gun in the other; Lamar Young followed a short distance behind. After D.J. reached the other side of the street, he held the cocaine out toward Alston and repeatedly told him to get out of the car. When Alston refused, D.J. fired two bullets into his head, killing him.[4] Appellant then walked over to the car, re-

1. The jury also found appellant guilty of attempted robbery while armed, but the trial court did not sentence him for that offense because it merged with the felony murder. In addition, appellant was charged with carrying a pistol without a license (CPWL) and conspiracy to distribute cocaine. The jury acquitted him of CPWL, however, and the conspiracy count was severed from the rest of the indictment before trial.

2. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

3. While the appeal from his conviction was pending, appellant filed a motion in the trial court to vacate his sentence pursuant to D.C.Code § 23–

110 (1989). The appeal was stayed pending a ruling on that motion. The § 23–110 motion was denied after a hearing, and appellant noted a second appeal, which was consolidated with the first one. Appellant makes no claim of error with respect to the § 23–110 motion, and thus we affirm the order denying it.

4. On cross-examination Young testified that D.J. shot Alston because he believed Alston was reaching down to grab a weapon. A police officer later found a knife in a sheath lying on the floor of the Maxima, near the front door on the driver's side.

moved the keys,[5] and told the crowd of onlookers to stay away from the car and from Alston. Shortly after the shooting, appellant told Lamar Young to find D.J. and "get the gun."

When Detective Antonio Duvall arrived at the scene, he was approached by another officer who told him that a witness wanted to speak to him about the shooting. That witness turned out to be appellant. He entered Duvall's cruiser and reported that he had seen a gray van pull up alongside the Maxima, that two men had jumped out of the van, and that one of the men had fired two shots into the car. Appellant described the shooter as a dark-skinned black man between four feet nine inches and five feet tall, weighing approximately 110 pounds. He told Detective Duvall that this man was a member of a gang run by another man named "Vito," who he said was standing across the street at that very moment.[6] Duvall gave him his name and telephone number and told him to get back in touch, and appellant left.

A few hours later, at about 6:00 a.m. on August 1, appellant called Detective Duvall at the police station. He gave the detective his name, address, date of birth, and telephone number, and then repeated the same story he had previously told in the cruiser. Later that day appellant told Dorsey and Young that if they were ever questioned about the shooting, they should say that some men to whom Alston owed money got out of a gray van and shot him.

About three weeks later, on August 23, appellant gave a different account of the shooting to two other detectives in a videotaped statement. The videotape was admitted into evidence and played for the jury. In it appellant stated that a "New Yorker" got out of the van and began to argue with the driver of the Maxima about money which the latter supposedly owed the former. After the argument, appellant said, a short man with a big nose got out of the van and shot the man in the Maxima twice. The van drove away, and a "New Yorker" named Vito grabbed appellant, took him into an alley, and pistol-whipped him.

In September appellant called Detective Donald Gossage and recounted yet another version of the shooting. This time appellant said it was D.J. who had shot the driver of the Maxima. Appellant also claimed that after the shooting he jumped into the Maxima, which was starting to roll away. He pulled the emergency brake and removed the keys, which he then gave to "some boy." Appellant offered to persuade D.J. to confess to the murder and to tell the police where the gun was hidden. He explained to Detective Gossage that he had previously given Detective Duvall a different account of the incident because he had been scared. He also told Gossage that his car was not in need of major repairs, but that he was merely waiting for some small parts.[7]

The defense presented testimony from the mother of appellant's son, Angela Goldston, and a Public Defender Service staff investigator, Arminda Valles. Ms. Goldston testified that shortly after the murder she had received a series of telephone calls threatening to harm her son if she said anything about the shooting to anyone. She admitted that even though she had spoken to defense counsel and appellant had spoken to the police, her son had not been hurt. Ms. Valles testified that she had interviewed Dominic Dorsey about three months before the trial, and that two of his statements on that occasion contradicted his trial testimony. He told Ms. Valles that he had never seen appellant hand anybody a gun or give any drugs to D.J. He also said, however, that he had seen D.J. shoot the driver of the Maxima, a state-

---

5. A crime scene search officer testified that when he examined the car that night, the keys were missing.

6. Duvall testified that appellant did not appear to be nervous or frightened, although he said he was afraid.

7. The government's theory at trial was that appellant had wanted Alston's car because his own car needed to be repaired and he had been unable to get the necessary parts. Tony Morgan, Lamar Young, and Dominic Dorsey each testified that appellant owned a Nissan Maxima which had been having transmission problems. Dorsey said that he and appellant had gone to several places in search of a transmission for appellant's car.

ment that was consistent with his trial testimony.

## II

Appellant argues that the trial court erred in denying his motion for a mistrial after a government witness made a statement that was highly prejudicial. In response to a question from the prosecutor about how appellant was dressed on the night of the shooting, Tony Morgan said, among other things, that appellant "always wore a bullet-proof vest." Defense counsel immediately asked to approach the bench, and at the bench she moved for a mistrial, arguing that whether appellant wore a bullet-proof vest was not relevant to any issue before the jury and that the mention of it was "highly inflammatory" and "extraordinarily prejudicial." After a lengthy discussion, the court took the matter under advisement and said it was "not going to grant a mistrial right now."

> My view is that this is not other crimes evidence. That is not—I don't believe that that is the issue. I believe that Mr. Howes [the prosecutor] is correct when he says that wearing a bullet-proof vest is not against the law.

> I agree with the defense position that it is simply not relevant to any issue before the Court. . . . A mistrial is a serious remedy. I'm not so certain that the prejudice that [the defense] claims adheres in this testimony is not—is not far overstated. The fact of the matter is, there will be testimony in this trial that will suggest that Mr. Smith is a drug dealer, period.

> I'm going to think about this some more. Perhaps go through the entire case, then make the ruling.

The court then offered to tell the jury to disregard the evidence, but defense counsel declined a curative instruction because she feared that it would only highlight the statement in the minds of the jurors. Later in the trial, the court denied the mistrial motion. Before this court appellant renews the argument that Morgan's comment about the bullet-proof vest was so prejudicial that an instruction would have no curative effect and that declaring a mistrial was the only way to dispel the prejudice. We disagree.

A decision whether to declare a mistrial is committed to the sound discretion of the trial court. *E.g., Edelen v. United States,* 627 A.2d 968, 972 (D.C.1993) (citing cases). We will not disturb the court's denial of a motion for mistrial except "in extreme situations threatening a miscarriage of justice." *Goins v. United States,* 617 A.2d 956, 958 (D.C.1992) (citing *Beale v. United States,* 465 A.2d 796, 799 (D.C.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984)); *accord, Lee v. United States,* 562 A.2d 1202, 1204 (D.C.1989). In this case we find no abuse of discretion.

The trial court concluded that although Morgan's remark was prejudicial, the prejudice was not so great as to warrant a mistrial. Our case law supports this conclusion. Indeed, this court has consistently upheld refusals to grant a mistrial when the challenged evidence has been significantly more prejudicial than in this case. *See, e.g., Clark v. United States,* 639 A.2d 76, 79 (D.C.1993) (witness' reference to defendant's prior incarceration did not require mistrial); *Goins, supra,* 617 A.2d at 958–959 (no mistrial when detective made reference to defendant's criminal record); *Irick v. United States,* 565 A.2d 26, 38–39 (D.C.1989) (reference to defendant's nickname of "Dirty Harry" was harmless error, if any, because it added little to the evidence). We are satisfied that Morgan's remark about the bullet-proof vest did not approach the level of prejudice that would require a mistrial, particularly in light of other substantial evidence which tended to depict appellant as a drug dealer.[8]

Moreover, "[w]henever possible, the court should seek to avoid a mistrial by

8. At trial defense counsel's argument was based in part on the rule articulated in *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), that, with certain exceptions, evidence of other crimes committed by the defendant in the past is not admissible. We agree with the trial court that *Drew* is not applicable here because "wearing a bullet-proof vest is not against the law." *See Wheeler v. United States,* 470 A.2d 761, 769 (D.C.1983) (*Drew* does not apply unless prior act is "minimally in the nature of a criminal offense").

appropriate corrective action which will minimize potential prejudice." *Goins v. United States, supra,* 617 A.2d at 958. Thus a trial court does not abuse its discretion when prejudice can be cured by an instruction to the jury, and a corrective instruction is offered but declined. *Id.* at 959. In this case the court offered to give a curative instruction to minimize any potential prejudice. It was certainly defense counsel's prerogative to decline the offer for strategic reasons, but that does not mean that we must now reverse the conviction. We are not persuaded that a mistrial was the only available corrective measure, and thus we find no abuse of discretion in the court's ruling.

### III

 Appellant next argues that the court erroneously allowed both Young and Dorsey to testify that appellant, after giving D.J. a gun and some drugs, told him to "watch the strip" while he was gone. Relying on *United States v. Shelton,* 202 U.S.App.D.C. 54, 628 F.2d 54 (1980), appellant argues that the government offered this testimony in an attempt to portray appellant as "an undesirable, a member of the drug underworld...." *Id.* at 58, 628 F.2d at 58. He claims that this statement was inadmissible as "other crimes" evidence under *Drew v. United States, supra* note 8, and its progeny, and that it was irrelevant and highly prejudicial.

 A decision on the admissibility of evidence, of course, is committed to the sound discretion of the trial court, and we will not disturb its ruling absent an abuse of discretion. *See, e.g., Roundtree v. United States,* 581 A.2d 315, 328 (D.C.1990); *Johnson v. United States,* 452 A.2d 959, 960 (D.C. 1982). The court ruled that the evidence at issue here was relevant because it was probative of appellant's control over the fourteen-year-old D.J., and thus it supported the government's theory that appellant was an aider and abettor of the murder committed by D.J. We see nothing unreasonable in this ruling.

Nor is the court's analysis weakened by the fact that the admonition to "watch the strip" occurred two or three hours before the shooting. If anything, the passage of time suggests that appellant's control over D.J.'s actions that night was continuous, and thus enhances the probative value of what appellant said. Finally, the jury could reasonably find that the gun appellant gave to D.J. was the murder weapon, and that appellant therefore aided and abetted the murder.[9] Thus the circumstances under which the gun changed hands, including the "watch the strip" remark, completed the story of the crime on trial by placing it in the context of other events close in time and place. *See Toliver v. United States,* 468 A.2d 958, 960–961 (D.C.1983); *Green v. United States,* 440 A.2d 1005, 1007 (D.C.1982). We see no abuse of discretion in the court's ruling that this evidence was relevant.

 We also reject appellant's argument that the "watch the strip" incident was "other crimes" evidence prohibited by *Drew.* Telling someone to "watch the strip" is not illegal, even if it suggests that the reason for watching the strip may have something to do with illegal conduct; thus there was no *Drew* violation. *See, e.g., Hawkins v. United States,* 482 A.2d 1230, 1232 (D.C.1984) (testimony that substances used as "cutting reagents" in packaging of drugs for distribution were found in defendant's home "was not 'other crimes' evidence since possession of these substances is not illegal"); *Wheeler v. United States, supra* note 8. Furthermore, contrary to appellant's contention, the testimony at issue here was not so prejudicial as to portray him as a "major figure in the drug underworld," especially when there was other evidence that appellant was involved in drug trafficking.

For these reasons we find no abuse of discretion, and hence no reversible error, in the admission of the "watch the strip" remark.

---

9. "[P]roof of presence at the scene of a crime plus *conduct which designedly encourages or facilitates a crime* will support an inference of guilty participation in the crime as an aider and abettor." *Jefferson v. United States,* 463 A.2d 681, 683 (D.C.1983) (emphasis added; citation omitted). There can be no serious doubt that giving the murder weapon to the murderer is conduct which facilitates the murder.

## IV

█ Finally, appellant contends that the trial court erred in declining to examine the transcript of an earlier juvenile proceeding which might have contained *Brady* material.. He asserts that this transcript, which includes the testimony of an eyewitness to the shooting, may contain statements inconsistent with other evidence at trial. He maintains that he should have had access to this transcript or that the court, at a minimum, should have conducted an *in camera* inspection in order to determine whether or not it contained exculpatory evidence.

On the night of Alston's murder, Andre Wheeler was standing on a rooftop overlooking 59th and Blaine Streets and was a witness to the shooting. He testified in an earlier juvenile proceeding against D.J. but was not available to testify at appellant's trial.[10] Defense counsel requested that the transcript of Wheeler's testimony be either turned over to her or reviewed by the court *in camera* because she believed that Wheeler's testimony was inconsistent with the testimony of other government witnesses. Specifically, she asserted that Wheeler's testimony might help to establish that D.J. acted on his own, without direction from appellant, when he approached Alston's car on the night of the shooting. In response to defense counsel's request, the prosecutor said:

> [T]he defendant may be entitled to it if it would exculpate him as *Brady*. I don't believe the defendant is entitled to it if there are *minor inconsistencies* in the testimony as to how the shooting happened.... I don't believe there would be any other grounds for the defendant to have that testimony, grand jury or trial, unless there was something in there that would exculpate Mr. Smith. [Emphasis added.][11]

After hearing arguments from both sides, the court said that it did not want to "look over the shoulder of the prosecutor" and refused to conduct an *in camera* inspection or to

order the prosecutor to make the transcript available to the defense. Appellant argues that this ruling was error and urges us to review the sealed transcript for exculpatory evidence.

*Brady v. Maryland, supra* note 2, requires the government to disclose evidence in its possession if the evidence is "material either to guilt or to punishment...." 373 U.S. at 87, 83 S.Ct. at 1197.

> [E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), cited in *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987); see *Bagley,* 473 U.S. at 685, 105 S.Ct. at 3385 (White, J., concurring). The government maintains that the decision to disclose or not to disclose information "rests in the first instance with the prosecutor," *United States v. Brooks,* 296 U.S.App.D.C. 219, 223, 966 F.2d 1500, 1504 (1992), and that the court is under no obligation to "check behind" the prosecutor's decision unless defense counsel makes a *prima facie* showing of mistake on the part of the prosecutor. *See Pennsylvania v. Ritchie, supra,* 480 U.S. at 59, 107 S.Ct. at 1002. The government reminds us that "[m]ere speculation that a government file may contain *Brady* material is not sufficient to require a remand for *in camera* inspection...." *United States v. Navarro,* 737 F.2d 625, 631 (7th Cir.), *cert. denied,* 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984); *see also Brooks, supra,* 296 U.S.App. D.C. at 222, 966 F.2d at 1503 ("Where the file's link to the case is less clear, the court must also consider whether there was enough of a prospect of exculpatory materials to warrant a search").

---

**10.** Wheeler was from New York, and defense counsel was unable to locate him.

**11.** The prosecutor also said he would "check again to see if there was anything that would

exculpate Mr. Smith in [Wheeler's] testimony." What the prosecutor may have found when he "check[ed] again" is not revealed in the record.

 We agree that appellant's "right to discover exculpatory evidence does not include the unsupervised authority to search through the [government's] files," and that "[i]n the typical case where a defendant makes only a general request for exculpatory material under *Brady* ... it is the State that decides which information must be disclosed." *Pennsylvania v. Ritchie, supra,* 480 U.S. at 59, 107 S.Ct. at 1002. This limitation prevents *Brady* from becoming a "discovery device" that would "impose an undue burden upon the [trial] court." *United States v. Navarro, supra,* 737 F.2d at 631. In this case, however, defense counsel's motion for a review of the transcript was more than a "general request" for exculpatory evidence. Counsel had reason to believe that the transcript of D.J.'s trial contained evidence that was inconsistent with some of the testimony at appellant's trial, namely, evidence that D.J. was acting on his own when he approached and shot Alston. If Wheeler's prior testimony did indeed show that D.J. approached Alston's car without direction from appellant, it would have undermined the government's aiding and abetting theory and thus would have been material to the issue of appellant's guilt. Thus appellant's request went beyond "mere speculation."

But even if that request could initially be so characterized, it was no longer mere speculation once the government acknowledged that there were "minor inconsistencies in the testimony as to how the shooting happened." At that point it was incumbent on the trial court to review the transcript and determine whether the inconsistencies were indeed "minor" or whether they were material to appellant's guilt or innocence. Without knowledge of what those inconsistencies were, the court was not in a position to make an informed decision "relevant to the exercise of its discretion." *Nolan v. Nolan,* 568 A.2d 479, 488 (D.C.1990); *see generally Johnson v. United States,* 398 A.2d 354, 364 (D.C.1979). We therefore hold that the trial court abused its discretion by not reviewing the transcript of Wheeler's prior testimony for potential *Brady* material after the prosecutor admitted that it contained "minor inconsistencies."

Accordingly, we remand the case for such a review, leaving it to the trial court to determine, in its discretion, how that review shall be conducted. If the court, after examining the transcript, finds a *Brady* violation and concludes that appellant's defense was prejudiced as a result, it shall order a new trial; [12] otherwise appellant's conviction shall stand undisturbed. In all other respects the judgment of conviction is affirmed. Because appellant makes no claim of error based on the denial of his motion under D.C.Code § 23–110, that ruling is also affirmed.

*Affirmed in part, remanded in part.*

---

12. We leave it to the trial court to decide, in its discretion, whether the transcript of Wheeler's prior testimony is or may be admissible under some exception to the hearsay rule.