**Dwight C. BEATTY, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 04–CF–1489.

District of Columbia Court of Appeals.

Argued Feb. 21, 2008.
Decided Sept. 11, 2008.

Amadasun was denied citizenship. We affirm.

## FACTUAL SUMMARY

On December 6, 2003, at approximately 11:45 a.m., Mr. Amadasun went to his estranged wife's apartment to pick up their daughter, Karina Amadasun (hereinafter "Karina").[1] At the time, Ms. Amadasun was dating Mr. Beatty. When Mr. Amadasun arrived at her apartment, located on the 300 block of Anacostia Road, in the Southeast quadrant of the District, she told him to "stay by the door to the hallway" and that his "daughter would be ready." Ms. Amadasun remained by the door and Karina came out of her bedroom and hugged her father. As Karina's father waited for her to get dressed, Mr. Beatty came out and said to him, "I told you not to come here no more ... what the f* *k you doing here." Mr. Amadasun responded, "listen, I'm here to pick up my daughter." Thereafter, the two men, standing approximately three feet apart, "started screaming at each other." Mr. Amadasun testified he smelled "just a little bit of alcohol" on Mr. Beatty's breath and that he [Mr. Beatty] appeared to be "drunk a little bit."

As the two men "talked back at each other," Mr. Beatty pulled out a gun from the front right side of the waistband of his pants. He held the gun at chest level, waving it back and forth at Mr. Amadasun and calling him "b* * *h" and "n* * * *r," and saying, "I'm going to shoot you; what the f* *k you doing here." Mr. Amadasun responded, "go ahead if you want to shoot me, I ain't going nowhere." He grabbed his daughter and said "c'mon, Karina, let's go" and they

Kenneth D. Auerbach, Silver Spring, MD, appointed by the court, for appellant.

Katherine M. Kelly, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Assistant United States Attorney, were on the brief, for appellee.

Before REID, Associate Judge, FARRELL, Associate Judge, Retired,* and KING, Senior Judge.

REID, Associate Judge:

Appellant, Dwight C. Beatty, was convicted of assault with a dangerous weapon; possession of a prohibited weapon; carrying a dangerous weapon; and felony threats. These convictions arose out of an incident between Mr. Beatty and Kingsley Amadasun, a lawful permanent resident and the estranged husband of Mr. Beatty's girlfriend, Cheryl Amadasun, an American citizen. Mr. Amadasun was the government's main witness, and prior to trial, Mr. Beatty made a *Brady* demand, requesting information regarding a denial of Mr. Amadasun's citizenship application. Mr. Beatty alleged that this information contained evidence of bias, because he believed that Mr. Amadasun's application for citizenship was denied because Ms. Amadasun separated from Mr. Amadasun, due in part to her relationship with Mr. Beatty. Mr. Beatty challenges the trial court's denial of his request for an *in camera* inspection of a document showing the reason Mr.

---

* Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

1. Kingsley and Cheryl married in 1995, and at the time of the trial, they had been separated for "almost two and a half years."

proceeded downstairs. Mr. Beatty followed them down to the second floor with the gun pointed at Mr. Amadasun's head and said, "you can't say nothing now, you b* * *h n* * * *r; I'm going to use it." Mr. Amadasun responded, "go ahead, use it, why don't you drop your gun, let's go outside to, to see if you could do anything to me." Mr. Beatty "didn't do anything" and "went back upstairs." Karina and her father got into his car. He drove to a gas station on Minnesota Avenue, and used a pay phone to call 911.

Metropolitan Police Department ("MPD") Officer George Hill responded to Mr. Amadasun's 911 call at the 3900 block of Minnesota Avenue. He testified that Mr. Amadasun "appeared to be in total disbelief," and "upset," while his daughter appeared "shaken" and "a little disturbed." Officer Hill spoke with the father and the daughter and accounts of the incident were "consistent" with each other. The officers went to Ms. Amadasun's apartment and spoke with her. She gave "at least two or three different stories" about the incident, none of which involved a gun.

On December 21, 2003, Mr. Amadasun and his estranged wife met near the intersection of Minnesota and Pennsylvania Avenues, so that Karina could visit her father. Karina said to her father, "remember the guy that pulled the gun at you," "he [is] at my house." Mr. Amadasun called the police. Two officers responded and drove with him to Ms. Amadasun's apartment, entered it and arrested Mr. Beatty.[2]

On July 2, 2004, Mr. Beatty filed a "Specific Brady Demand," requesting that the government provide documentation in possession of the United States Citizenship and Immigration Service (hereinafter "USCIS") relating to any pending hearing or action concerning Mr. Amadasun's immigration residency and/or citizenship status. Mr. Beatty stated that he was making continued efforts to obtain the records, but had "been unsuccessful in ascertaining [the] office upon which to serve a subpoena." On July 19, 2004, the government faxed a response to him disagreeing "with the *Brady* characterization of the defense request." The response included a decision letter from the Department of Homeland Security (hereinafter "DHS"), which stated that Mr. Amadasun's application for citizenship had been denied. The decision letter also referenced an attachment, which noted the reasons for the denial. This attachment was not included in the government's faxed response.

On or about August 5, 2004, Mr. Beatty filed a "Motion to Compel Discovery," requesting that the "government be instructed to obtain the attachment, and any additional information regarding Kingsley's citizenship application." Mr. Beatty asserted that Mr. Amadasun's application for citizenship was based upon his marriage to Ms. Amadasun, an American citizen; and that he is separated from her, due in part to her relationship with Mr. Beatty.[3] Mr. Beatty alleged that the information contained in the attachment

---

2. On February 18, 2004, Mr. Beatty was indicted on one count of assault with a dangerous weapon, in violation of D.C.Code § 22–402 (2001); one count of possession of a prohibited weapon, in violation of D.C.Code § 22–4514(b); one count of carrying a dangerous weapon, in violation of D.C.Code § 22–4504(a); and one count of felony threats, in violation of D.C.Code § 22–1810.

A jury trial commenced before the Honorable Judge Lynn Leibovitz, and on August 18, 2004, the jury found Beatty guilty on all counts.

3. Ms. Amadasun testified that she met Mr. Beatty sometime prior to July 2001, and began seeing him in July 2001, when she was separated from Mr. Amadasun.

may be evidence of bias, providing a reason for why Mr. Amadasun does not like him. He maintained that he was unable to locate the office "authorized to act as an agent for CIS" and that the records were "in the sole possession of the government." He asked the trial court to make an *in camera* inspection of the material, if the government continued to claim that the information contained in the attachment was irrelevant to the case.

On August 11, 2004, the court addressed Mr. Beatty's motion to compel. His defense counsel stated that a contact with Immigration Customs Enforcement (hereinafter "ICE") informed him that one of the two people on whom he would have to serve a subpoena was the "district agency supervis[or]," who was located in Vermont. This contact also stated that the disclosure of the documents sought could violate Mr. Amadasun's privacy rights, and thus would not be permitted. Defense counsel reiterated that the only document he sought was the document attached to the decision letter denying Mr. Amadasun's citizenship application. When pressed by the trial court about the contents of the document sought, defense counsel stated, "it is my assumption that if the application is under the condition of marriage, the denial was because of dissolution would be—or at least an element would be at dissolution of the marital union." However, as the court noted, the prosecutor had earlier proffered that the attachment sought was in the custody of Mr. Amadasun and not the government. The prosecutor also stated the attachment "says nothing at all about [ ] a link between [Mr. Beatty] and the denial of citizenship or naturalization." In denying Mr. Beatty's motion to compel, the court stated,

> [T]he documents [Mr. Beatty] requests by way of *Brady* demand are, in fact, A, not *Brady*; B, in any event not within the custody of the Government; and, C,

clearly not identified ... by [Mr. Beatty] in any specific way such that it appears to me that the request is, in fact, a fishing expedition and not the identification of documents which would be in any way *Brady* material or otherwise discoverable. I denied the motion to compel.

The trial court revisited the denial of citizenship issue during Mr. Amadasun's August 16, 2004 testimony as a government witness. On cross-examination, defense counsel inquired whether Mr. Amadasun had applied for citizenship. When the prosecutor objected, the trial court held a bench conference during which the judge specifically asked the prosecutor why Mr. Amadasun was denied citizenship. The prosecutor responded: "It has to do with a prior criminal conviction and arrest. And it has nothing to do with anything relating to this matter." The judge determined that Mr. Amadasun was denied citizenship in May 2003, but that the separation from his wife and her subsequent dating of Mr. Beatty took place two years before DHS issued the letter of denial. The judge then permitted defense counsel to ask Mr. Amadasun whether he had "any reason ... to believe that the citizenship application was denied because of ... the separation...." Mr. Amadasun replied, "No, that wasn't the reason." On redirect examination, Mr. Amadasun acknowledged that he had a 1999 District of Columbia conviction for attempted second-degree cruelty to children, which did not involve his daughter, Karina.

## ANALYSIS

■ Mr. Beatty claims that under *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the trial court erred by not making an *in camera* inspection of DHS's decision, denying Mr. Amadasun's application for citizenship. He

maintains that because there was no physical evidence, the case hinged on the credibility of the witnesses. He submits that Mr. Amadasun's application for citizenship was based on his marriage. He argues that Mr. Amadasun had a motive to falsely accuse him in retaliation for his relationship with Ms. Amadasun, which he assumed might have caused the breakup of Mr. Amadasun's marriage and thus the denial of his application for citizenship.

Under *Brady v. Maryland,* "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "In addition to exculpatory material, 'the government is required to disclose evidence ... that affects the credibility of a government witness where material to guilt or punishment.'" *Sykes v. United States,* 897 A.2d 769, 777 (D.C.2006) (quoting *Ebron v. United States,* 838 A.2d 1140, 1155 (D.C.2003)) (citations omitted); *see also Giglio, supra,* 405 U.S. at 154, 92 S.Ct. 763 ("when the reliability of a given witness may well be determinative of guilt or innocence, non disclosure of evidence affecting credibility falls within [the Brady rule].") (citation and internal quotation marks omitted). "Reversal will not be ordered on the grounds of failure to disclose under *Brady* 'absent a further showing that disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.'" *Sykes, supra* (quoting *Ebron, supra,* 838 A.2d at 1155) (citations omitted). "Reasonable probability, in this context means a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks omitted).

We review a trial court's decision on whether to conduct an *in camera* inspection of alleged *Brady* material for an "abuse of discretion." *Smith v. United States,* 665 A.2d 962, 969 (D.C.1995) (citing *Nolan v. Nolan,* 568 A.2d 479, 487–88 (D.C.1990)). A defendant's " 'right to discover exculpatory evidence does not include the unsupervised authority to search through the government's files,' and [ ] 'in the typical case where a defendant makes only a general request for exculpatory material under *Brady* ... it is the State that decides, which information must be disclosed.'" *Smith, supra,* 665 A.2d at 969 (quoting *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)); *see also United States v. Navarro,* 737 F.2d 625 (7th Cir.1984) ("Mere speculation that a government file may contain *Brady* material, to wit information about an informant's INS status being predicated on a cooperation agreement with the DEA, is not sufficient to require a remand for in camera inspection much less reversal for a new trial"). However, where defense counsel's request for exculpatory evidence goes "beyond mere speculation," the trial court's decision not to make an *in camera* examination of such evidence may be an "abuse of discretion." *Id.*

In *Smith,* the defendant and a juvenile co-defendant were charged with distribution of cocaine, felony murder and other offenses. *Smith, supra,* 665 A.2d at 964. The juvenile defendant was tried earlier in a separate juvenile proceeding. *Id.* at 968. Appellant's counsel requested the transcript of the juvenile proceeding asserting that testimony of an eyewitness to the shooting may contain statements inconsistent with other evidence at trial. *Id.* Appellant's counsel requested that the transcript be turned over or reviewed by the court *in camera.* *Id.* Acknowledging "minor inconsistencies" in how the shooting happened, the prosecutor did not be-

lieve the defense was entitled to the transcript because, in his opinion, it would not exculpate him under *Brady*. *Id.* The trial court declined to do an *in camera* inspection or to order the prosecution to turn the transcript over to the defense because "it did not want to look over the shoulder of the prosecutor." *Id.* In reversing the trial court's decision, we concluded that defense counsel's request was more than a "general request" for exculpatory evidence because trial counsel had reason to believe that a transcript from the juvenile proceeding contained evidence that was inconsistent with the testimony of government witnesses. *Id.* at 969. The request "was no longer mere speculation" once the government acknowledged that there were "minor inconsistencies in the testimony as to how the shooting happened." *Id.* The circumstances in this case are different.

Here, Mr. Beatty's *Brady* request and subsequent motion to compel to show bias apparently were based, initially, on a good faith belief, or assumption, that Mr. Amadasun's citizenship application was denied because of the dissolution of his marriage, and therefore, he was biased against appellant.[4] Indeed, defense counsel stated, "it is my assumption that if the application is under the condition of marriage, the denial was because of dissolution [ ]-or at least an element would be at dissolution of the marital union." Under these circumstances, Mr. Beatty's request appears to be more than a "general request" because he had reason to believe that the dissolution of the marriage caused the denial of Mr. Amadasun's application for citizenship. However, as an officer of the court, the prosecutor proffered that Mr. Amadasun's application was denied because of a criminal conviction, *see United States v. Hernandez*,[5] and Mr. Amadasun acknowledged during trial that he had a 1999 conviction for attempted second-degree cruelty to children.[6] He also stated that his separation from Ms. Amadasun was not the reason for the denial of citizenship. Consequently, on this record, we are satisfied that the trial court did not abuse its discretion in declining to conduct an *in camera* inspection of the attachment to the letter denying Mr. Amadasun citizenship.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

---

4. It should also be noted that the record does not reflect that Mr. Amadasun's application for citizenship was "based on marriage." Mr. Beatty's counsel only proffered to the court that the application for citizenship was based on marriage. This is significant because under the Immigration & Nationality Act, 8 U.S.C. § 1427(a)(1), a person, "after being lawfully admitted for permanent residence" and who has resided continuously in the United States for at least five years, can apply for naturalization. A person, who is applying for naturalization based on marriage, only has to have lived in the United States as lawful permanent resident for three years. 8 U.S.C. § 1430(a). Absent from the record is how long Mr. Amadasun was in the United States, how long he was a permanent resident, and when he applied for naturalization. It is possible that Mr. Amadasun's application for citizenship was not based on his marriage but instead based on his continuous residence in the United States for five years as a permanent resident.

5. 31 F.3d 354, 361 (6th Cir.1994) ("The prosecuting attorney [ ] informed the court that he had reviewed the sealed document and that it did not contain any *Brady* material. The prosecuting attorney is an officer of the court and, absent some indication of misconduct, the court is entitled to accept his representation on this issue.").

6. It should also be noted that 8 U.S.C. § 1427(a)(3) requires that a lawful permanent resident applying for naturalization must be "a person of good moral character."