*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-616

ELLSWORTH W. COLBERT, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-3958-12)

(Hon. Herbert B. Dixon, Jr., Trial Judge)

(Argued June 23, 2015                    Decided October 22, 2015)

*Jenifer Wicks* for appellant.

*Patricia A. Heffernan*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Edward O'Connell*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and BECKWITH, *Associate Judges*, and NEWMAN, *Senior Judge*.

Opinion for the court by *Associate Judge* THOMPSON.

Dissenting opinion by *Associate Judge* BECKWITH at page 22.

THOMPSON, *Associate Judge*: After a jury trial, appellant Ellsworth Colbert was convicted of manslaughter while armed, assault with a dangerous weapon (knife) ("ADW"), and carrying a dangerous weapon (knife) ("CDW").[1] On appeal, he argues that he did not receive a fair trial because the government was not required to disclose a police file, obtained mid-trial, pertaining to the decedent's out-of-state conviction for assault. Appellant also assigns as error an instruction the trial court gave in response to a question from the jury. For the following reasons, we affirm.

## I.

The jury heard the following evidence: On the morning of March 4, 2012, the decedent, Robert Wright, was walking his friend's dog. He was accompanied by another friend, Anthony Davis. Davis testified as follows. As he and Wright were passing appellant's home, the dog, still on its leash, walked into appellant's front yard. In response, appellant came out of his house, walked up to the other two men in an "aggressive" manner, and asked, "[D]id your dog sh*t in my yard[?]" Appellant was holding a walking stick at the time. Pulling out a knife,

---

[1] The jury found appellant not guilty of first-degree premeditated murder while armed, second-degree murder while armed, assault with intent to kill while armed (AWIKWA), and assault with a dangerous weapon (walking stick).

appellant then said, "[I]s this your dog?  I'm going to kill this motherf*cker."
Davis described the blade as serrated and about two inches long.

At this point, Wright told appellant that the dog belonged to a nearby
neighbor, Sean Hurd.  According to Davis, appellant then walked ahead to Hurd's
home, "bang[ed]" on the door, and confronted Hurd on his front porch.  Davis and
Wright trailed behind.  From across the street, Davis heard appellant tell Hurd,
"[D]on't have your dog sh*tting in my yard."

A car was parked in Hurd's driveway.  Wright began walking along the right
side of the driveway, as if to take the dog around the side of the house to the
backyard, while appellant and Hurd were still having an "animated talk" on the
other side of the car, near the front door.  When Wright reached the top of the
stairway that led down the side of the house to Hurd's backyard, he told appellant
"[s]omething along the lines of . . . 'the dog didn't shit in your yard, you dumb
*ss.'"  Appellant turned and approached Wright.  Wright "possibly" made another
comment that Davis did not hear, and then, "all of a sudden[,]" appellant began
"throwing punches in the back of" Wright's head.  Davis did not see a knife in
appellant's hand at that point, but appellant was still carrying his walking stick.

Wright eventually retreated down the steps around the house, and appellant began to walk away, back down the driveway. A few seconds later, Wright came back up the steps, carrying a shovel. At this point, appellant, who by now was in the middle of the street, said, "I'm going to get my son to kick your *ss, Rob [Wright]." Wright, with shovel in hand, walked past Davis, who was standing in the driveway, and Davis noticed a "gash mark" on Wright's neck, which had not been there earlier in the morning. Wright continued into the street, where appellant had turned around to face him.

Wright, holding the shovel with his hands apart, first used it in a "defensive manner" while appellant, who was still holding his walking stick (and, Davis presumed, his knife as well, as Davis had never seen him put it away), was "swinging" his arms. Then Wright began using the shovel in a "jousting" motion and hit appellant about the head and shoulders, leaving a "red blood spot on [appellant's] head on the right side." During this same interval, appellant hit Wright "on his head, his shoulder, [and] around the upper torso area" with his walking stick.

As appellant and Wright were "grappling" with each other, they moved out of Davis's view, behind a large bush planted in the front yard. They remained

behind the bush for "about two minutes," in Davis's estimation, and then Wright alone, without the shovel, came back into view and stumbled to the ground. Appellant said, "[C]ome on, man, come on[,]" and Wright got back up, only to "hiccup" and "f[a]ll face flat on the ground" without breaking his fall. Appellant walked back to his house.

Hurd, who had watched the fight from beside his front porch, corroborated key aspects of Davis's testimony. He said that he was already on his front porch when he saw Wright and Davis approaching, with appellant a few feet behind them. Appellant was carrying a walking stick and a "little switchblade knife." He looked "angry" and "upset." Upon approaching within a few feet of Hurd, appellant said, "[D]on't let this motherf*cker walk your dog. He [is] irresponsible. This dog [has] been sh*tting in my yard. . . . I was about to stab this dog and this mother*cker right here[.]" Wright and appellant exchanged words, which included Wright saying, "[Y]ou and your son don't even keep up with each [other.]" This comment seemed to "upset" appellant, and he "swung [his] knife at" Wright's neck.

Hurd saw Wright drop the dog's leash and go around the side of the house. Appellant began to walk away, as if back to his house, while repeatedly saying,

"I'm going to get my son to f*ck you up, Rob." Wright then re-appeared with a shovel, walked after appellant, and the two "squared off" in the middle of the street. Although by this point Hurd could not see a knife in appellant's hand, he also had not seen appellant put away the knife he was holding earlier.

Wright and appellant swung at each other simultaneously, Wright with the shovel, appellant with his walking stick. Appellant then "rushed" Wright, causing Wright to drop the shovel, and "they both fell on the ground" and behind a bush, out of Hurd's sight. From what Hurd heard, the two continued to "tussle" for "a few seconds[.]" Then, Hurd saw appellant emerge from behind the bush and start walking back down the street to his house. As he did so, appellant repeatedly said, "I told you not to f*ck with me." Wright, meanwhile, had begun to walk back to Hurd's driveway with a "blank look on his face." He said, "[A]re you going to stab [me], though?" Then he fell.

Testimony from medical experts revealed that Wright had been stabbed eight times. He had a one-and-three-quarter-inch wound in the left side of his neck, a four-inch-deep stab wound in his right chest (which pierced the aorta and the pericardial sack encompassing the heart), a one-and-a-half-inch-deep stab wound in his left abdomen, a one-and-three-quarters-inch-deep stab wound in his

left back (which fractured the ninth thoracic vertebra), and four cutting wounds on his left wrist and hand. Although Hurd called 911 immediately after Wright's fall, efforts to revive Wright failed. According to expert testimony, the "wound to the chest [wa]s directly fatal[.]"

## II.

Appellant argues that the government violated its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to turn over a police investigative file, which prosecutors obtained mid-trial, pertaining to the decedent's out-of-state conviction for assault with a deadly weapon. Appellant does not, however, specifically complain of trial court error in this regard, no doubt because he never asked the trial court to order the disclosure or to sanction the government.

The pertinent background is as follows: On December 21, 2012, as part of a discovery supplement, prosecutors forwarded to defense counsel a National Crime Information Center (NCIC) report indicating that an individual by the name of Robert Wright had been convicted of assault with a deadly weapon in North Carolina in 1998. The government noted that it was "not certain . . . that the

charges on the report . . . pertain to the instant decedent." On January 7, 2013, the day before jury selection began, defense counsel notified the trial court that his investigator, who had proven to be unreliable, had failed to follow up on the NCIC report to determine whether the Robert Wright mentioned therein was the decedent in this case. Through a Google search and by talking with people in the decedent's neighborhood, defense counsel had managed to verify that people had heard that the decedent had been convicted of assault in North Carolina and that he was living in North Carolina in 1998. Although defense counsel never specifically requested help in verifying that the decedent had committed the North Carolina crime in question, the trial court responded to defense counsel's account by "directing" the prosecutors "to devote whatever resources you can within reason to either confirming or refuting the existence of that conviction as it relates to the decedent[.]"

On January 10, 2013, the second day of trial, the prosecutor advised the court that the government not only had confirmed the "information contained in the NCIC report" with one of the decedent's family members, but also, on an understanding that the court had "asked the Government to go beyond that and actually obtain the police file, if possible, from the North Carolina authorities[,]" had obtained the police file. The trial court replied, "I don't know that I asked for

all that but . . . some documentation of a conviction. Not necessarily a police file." Conceding that he must have misunderstood, the prosecutor indicated that he hesitated to "provide detailed police . . . investigatory files" to defense counsel, because the government would thereby "fe[e]d" to appellant information about the decedent which he may not otherwise have had, enabling him to use the information in his testimony should he take the witness stand. The court responded that if the prosecutor had something he thought the court had ordered the government to turn over, he should bring it to the court for *ex parte* review. When the prosecutor asked whether he should "do that right now," the court deferred its review, observing that "[a]pparently you have a lot of information there" and saying that it did not want to delay having jurors come in. Defense counsel expressed his understanding that the court would "deal with" the report from North Carolina and told the court that he did not have "anything [else] to raise" on the subject.

After reviewing the North Carolina file *in camera* and determining that it did not contain public documents but was, rather, "the investigative file either from the prosecutor's office or the Police Department" and also that defense counsel already had a print-out from the North Carolina court system that listed the conviction and its date, the court had the following exchange with defense counsel:

> Court: What do you need more than this [the conviction and its date] if the Government is willing to stipulate [to the conviction being the decedent's]?
>
> Defense counsel:  If the Government stipulates to that, the only other thing I would like to know is what weapon was used.

Defense counsel also assented when, a few moments later, the court summarized his position as, "want[ing] to . . . just stipulate what the offense was and what the weapon was and that's it."  At no point did defense counsel demand access to the North Carolina file or indicate (as appellant now argues) that he needed more time to investigate facts about the decedent's crime or needed access to the North Carolina police file in order to identify and perhaps call witnesses who had seen the North Carolina assault.

The parties eventually agreed on a stipulation, which defense counsel read the jury:

> On January 5th, 1998, Robert Leroy Wright[,] the decedent[,] was convicted of assault with a deadly weapon [in]flicting serious injury in Greensboro, North Carolina, and was sentenced to a term of incarceration of three years and two months.  Mr. Wright used a gun in the commission of this crime and[.]

The trial court interrupted counsel at that point, but said that a written copy of the stipulation would be given to the jury and asked whether there was any more evidence. Defense counsel said, "That's all, Your Honor." The court did not rule, and appellant did not ask the court to rule, on whether the government needed to disclose the North Carolina police file.

Appellant now argues, for the first time, that the entirety of the North Carolina police file should have been turned over to the defense because it was "clearly . . . in the government's possession" and the "outcome of [appellant's] trial would have been different had the defense been able to present at trial live testimony of the incident in North Carolina," rather than merely providing the description of the crime contained in the stipulation. Appellant relies on *Brady v. Maryland*, 373 U.S. at 87.

The government violates its obligations under *Brady* when it has suppressed, either willfully or inadvertently, information that is favorable to the accused, either because it is exculpatory or because it is impeaching, and prejudice has ensued, because the suppressed information is "material." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Information is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "Reasonable probability" means "a probability sufficient to undermine confidence in the outcome" of the trial. *Ebron v. United States*, 838 A.2d 1140, 1155 (D.C. 2003) (quoting *Farley v. United States*, 694 A.2d 887, 889 (D.C. 1997)).

Assuming, without deciding, that appellant did not waive his *Brady* claim when his counsel told the trial court that he sought nothing more than a stipulation regarding Wright's North Carolina conviction, we review appellant's unpreserved claim only for plain error. *See Paige v. United States*, 25 A.3d 74, 92 n.17 (D.C. 2011) (citing *United States v. Olano*, 507 U.S. 725, 734-36 (1993)).[2]

There is no dispute that information about the decedent's prior conviction was favorable to appellant because he was making a claim of self-defense. *See Johnson v. United States*, 452 A.2d 959, 961 (D.C. 1982) ("[I]n this jurisdiction an accused claiming self-defense in a homicide prosecution may attempt to show that

---

[2] To establish plain error, appellant must show that (1) "there was an error"; (2) "the error was clear or obvious"; (3) the error "affected [appellant's] substantial rights"; and (4) "the error seriously affected the fairness, integrity or public reputation of the judicial proceeding." *Comford v. United States*, 947 A.2d 1181, 1189-90 (D.C. 2008) (internal citations and quotation marks omitted).

the decedent was the aggressor by showing that the dead person was a bellicose and violent individual[.]").  It is also clear that the police file, by mid-trial, was in the government's possession, albeit only after the government, misunderstanding the trial court's directive, made efforts to obtain information not previously in its possession.[3]

Appellant's *Brady* claim fails, however, because he has not demonstrated that the contents of the police file were material to the case, i.e., that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.  The jury heard extensive evidence about the decedent's propensity for violence.  Davis testified that he had seen the decedent fight two different people on earlier occasions.  Two other witnesses testified about the decedent's fight with appellant's son around 1993, when the decedent also engaged in threatening behavior with a knife while standing outside the Colbert family home.  Finally, evidence of the North Carolina conviction, far from being suppressed, was

---

[3]    It is "axiomatic that [i]f the government does not possess the requested information, there can be no *Brady* violation." *Reyes v. United States*, 933 A.2d 785, 794 (D.C. 2007) (internal quotation marks omitted).  Nor does *Brady* imply a government "duty to investigate — and come to know — information which the defendant would like to have but the government does not possess." *Guest v. United States*, 867 A.2d 208, 212 (D.C. 2005) (quoting *Lewis v. United States*, 393 A.2d 109, 115 (D.C. 1978)).

admitted via stipulation. In total, the evidence about these several incidents enabled defense counsel to argue extensively in closing that the decedent had a violent disposition.

Appellant directs us to *Sykes v. United States*, 897 A.2d 769 (D.C. 2006), as support for his argument that, had he obtained the police file, he would have been able to put on live witnesses describing the North Carolina assault, a strategy that he argues would have engendered a reasonable probability of altering the trial's outcome. Appellant's reliance on *Sykes* is misplaced. In *Sykes*, the key government witness was an informant who claimed to have heard Sykes admit to committing felony murder. 897 A.2d at 770-71. However, two other witnesses contradicted the informant during their grand jury testimony, and the testimony of these two witnesses was not disclosed to the defense until two days before trial, making it impossible for the two witnesses to be located. *Id.* at 772-76. The defense had to rely on excerpts of their grand jury testimony. *Id.* at 776. In analyzing Sykes's *Brady* claim, we reasoned that "there is a reasonable probability that the live testimony of either [witness], or both," likely procurable upon earlier disclosure of the witnesses' grand jury testimony, "would have altered the result[.]" *Id.* at 779. We concluded that Sykes's inability to have these witnesses subjected to direct and cross-examination, so that the jury could view their

demeanor, or to have these witnesses present a fuller picture of their version of events than that provided in the grand jury transcript, limited the jury's ability to determine whether it should believe these witnesses over the government informant. *Id.* at 780-81. In other words, the jury's ability to judge the credibility of the two witnesses was crucial.

Unlike in *Sykes*, where the jury had the duty to decide which version of events was correct based on a credibility determination, here there is no dispute that Wright's North Carolina conviction occurred. Even if we assume both that the defense could have procured the presence of witnesses to the North Carolina assault that occurred fourteen years earlier and that the trial court would have allowed those witnesses to testify,[4] we are unpersuaded that the jury's hearing in-person testimony about the assault would have appreciatively aided jurors in determining what weight it should give to the decedent's history of violence when analyzing appellant's self-defense claim, or would otherwise have been outcome

---

[4] "[A] trial judge is not obliged to accept all evidence in whatever form it is offered for presentation to a jury." *Johnson*, 452 A.2d at 961. We certainly cannot say that the trial court would have erroneously exercised its discretion had it declined to permit witnesses to the North Carolina assault to testify about that incident. *Cf. Winfield v. United States*, 676 A.2d 1, 5 (D.C. 1996) ("[T]he trial judge will have discretion to exclude marginally relevant evidence creating the danger that proof of prior dealings or hostility between the victim and third persons will distract the jury from the issue in this case.").

determinative.  We therefore can find no obvious error in the trial court's failure *sua sponte* to require the disclosure of the North Carolina police file.

We also note that the jury likely accepted that appellant acted to defend himself against Wright because, despite the evidence of Wright's several, deep stab wounds to the chest, abdomen, and back, the jury acquitted appellant of charges — first-degree murder, AWIKWA, and second-degree murder — whose elements require either intent to kill or absence of mitigating circumstances (such as an act of violence by the victim).[5]  It seems likely that the jurors found appellant guilty of manslaughter on a theory that he unreasonably used more force against Wright than was necessary.[6]  Appellant has not shown how more information about Wright's North Carolina conviction for assault with a gun would, to a reasonable probability, have affected the jury's deliberations about whether appellant used excessive force in inflicting the fatal knife wounds after (according to the evidence) Wright dropped his shovel.  And even if, as our dissenting colleague

---

[5]    Moreover, in one of its notes, the jury asked, "In considering self-defense[,] once it becomes an act of self defense[,] does excessive force to protect yourself outweigh the act of self defense[?]"

[6]    The jury was instructed that "[e]ven if the other person is the aggressor and the defendant is justified in using force in self-defense, he may not use any greater force than he actually and reasonably believes to be necessary under the circumstances to prevent the harm he reasonably believes is intended or to save his life or avoid serious bodily harm."

suggests, the jury's deliberations did not play out in the way we think likely, appellant has not "show[n] a reasonable probability" that, as the third prong of the plain-error test requires, the trial court's failure *sua sponte* to order the government to produce the contents of the North Carolina file "had a prejudicial effect on the outcome of his trial." *Kidd v. United States*, 940 A.2d 118, 127 (D.C. 2007) (internal quotation marks omitted).

## III.

During deliberations, the jury asked the following question:

> For [the charges of first degree murder, second degree murder, and manslaughter], must all elements be true at the same point in time? *OR* Could all elements be true at some point in time, though not necessarily at the *same* point in time? (Emphasis in original.)

The trial court's response essentially consisted of telling the jury to re-read the elements of each offense, paying special attention to those terms that refer to timing requirements:

> It is difficult to give you a response to your question that would cover every possibility of what you are considering. With respect to the timing of events, you should apply your everyday understanding of the words that define the elements of the offenses. For instance, in

the elements of first degree murder, the use of the word "after" should clearly indicate that certain elements and events may occur at different times. If you have further questions on this or any other issue, I will respond as quickly as possible.

Defense counsel's sole objection at the time the trial court proposed this instruction was that, in the interest of "balanc[e,]" he "want[ed] without being specific to indicate that a plain reading of the elements would also indicate some of the elements need to be present at the same time." The court declined to make this addition.

Appellant now argues that the trial court should have specifically instructed the jury that, with regards to manslaughter, "all elements must be true at the same point in time." He contends that "timing was of the utmost importance in determining [his] right to self-defense" because there were two separate incidents, "pre and post shovel," so that failure to instruct the jury specifically about the timing aspects "left the jury with an erroneous instruction of law[.]"

Appellant did not make this argument to the trial court, and it seems fair to say that he waived it. His counsel told the trial court that he wanted the court, "without being specific" and "without specifying the elements[,]" to note that some elements of first-degree murder, second-degree murder, and manslaughter must be

present simultaneously. His request for the court to make that response to the jury note is quite different from the manslaughter-specific instruction he now contends the court should have given.

But even if appellant did not waive this argument, his claim lacks merit; the trial court did not plainly err in failing to give appellant's desired instruction *sua sponte.* In reviewing the claim, we recognize that the "decision on what further instructions, if any, to give in response to a jury question lies within the sound discretion of the trial court." *Yelverton v. United States*, 904 A.2d 383, 387 (D.C. 2006) (quoting *Bouknight v. United States*, 641 A.2d 857, 860 (D.C. 1994)). Nevertheless, "[w]here a jury has demonstrated confusion, . . . the trial judge may not allow that confusion to continue, but must make an appropriate and effective response." *Whitaker v. United States*, 617 A.2d 499, 501 (D.C. 1992). And, when the jury has made known its "specific difficulties" understanding the law, "the trial court should clear them away with concrete accuracy." *Alcindore v. United States*, 818 A.2d 152, 155 (D.C. 2003) (internal quotation marks omitted).

Here, the jury's note did not, in any way, indicate which elements of which offense were the focus of the jury's question. As there were many possibilities, the trial court told the jury to re-read its instructions, paying special attention to the

timing requirements already included therein. This is an approach that we have acknowledged "may be appropriate in some circumstances." *Euceda v. United States*, 66 A.3d 994, 1008 (D.C. 2013). It was not plainly inappropriate here, because there was no indication in the jury note that the jury was misinterpreting the court's instructions or was misconstruing the elements of a crime. *Cf. Gray v. United States*, 79 A.3d 326, 337-38 (D.C. 2013) (holding that the trial court should have instructed the jury further about the crime of aiding and abetting because their question indicated that they were considering whether the defendant could be guilty based on conduct that could not legally constitute aiding and abetting); *Alcindore*, 818 A.2d at 155-58 (holding that further instruction was warranted when jury note indicated that the jury had reached a verdict that was inconsistent with the law). Moreover, the court's response to the jury note invited jurors to follow up with any further questions. The jury sent another note four hours later on the topic of self-defense (contrary to appellant's argument, the jury did not convict him of manslaughter "quickly" after receiving the court's response), demonstrating that it was quite capable of sending another question if it still needed assistance.

We also cannot discern how appellant's substantial rights were adversely affected by the trial court's failure to provide the instruction he now argues should

have been given.  The court instructed the jury that the elements of manslaughter while armed are:

> One, that the defendant caused the death of the decedent[.]
>
> Two, that *at the time he did so* he intended to kill or seriously injure the decedent or acted in conscious disregard of an extreme risk of death or serious bodily injury to the decedent.
>
> Three, that he, the defendant, did not act in self-defense.
>
> And four, *at the time of the offense* the defendant was armed with a knife.  (Emphasis added.)

Armed with the trial court's jury-note response directing jurors to read the elements carefully, and paying particular attention to the timing language already included (and italicized above), jurors undertaking a common-sense re-reading of the instructions on manslaughter would likely have understood that elements one, two, and four must occur simultaneously.  Any erroneous belief by the jury that the defendant did not need to be acting in self-defense throughout the incident would only have worked in appellant's favor.

For the foregoing reasons, the decision of the trial court is

*Affirmed.*

BECKWITH, *Associate Judge*, dissenting: The court holds that Ellsworth Colbert's claim under *Brady v. Maryland*, 373 U.S. 83 (1963), fails because he has not demonstrated that the contents of the North Carolina file were material to his murder trial. *Ante* at 14. That materiality determination, for me, is genuinely hampered by the fact that the trial court did not review the evidence as potential *Brady* material and that we do not know what that evidence is.

It is possible, as my colleagues state, that the admission of more details about the North Carolina offense would not have changed anything because the jurors, having already accepted that Mr. Colbert acted in self-defense, nevertheless convicted him of manslaughter because they believed he used excessive force. But that is not the only explanation for the jury's manslaughter conviction. Our cases recognize, for example, that jurors sometimes compromise. *See, e.g.*, *Garcia v. United States*, 848 A.2d 600, 602 (D.C. 2004); *Haynesworth v. United States*, 473 A.2d 366, 368 (D.C. 1984) (referring to "the often necessary process of compromise among jurors in their differing assessments of evidence"); *cf. Standefer v. United States*, 447 U.S. 10, 22 (1980) (stating that juries in criminal cases are permitted "to acquit out of compassion or compromise"). The jury in this case was also given a provocation instruction, and could have determined that Mr.

Colbert was guilty of manslaughter under a theory that he had acted in the heat of passion caused by adequate provocation.

However the jury's deliberations played out—and even under the excessive-force scenario assumed by my colleagues—it is hard to say that testimony about the details of the North Carolina offense could have had no impact on the verdict, particularly given the glaring evidentiary void at the moment in which Mr. Colbert inflicted the fatal stab wounds.[1] Those details could have brought to life an offense in which the decedent used a gun to inflict serious injury upon a victim. Perhaps the file would have shown that the decedent's conviction stemmed from a plea to a lesser offense, and that the decedent had actually committed a more serious crime than that to which he pled, such as assault with intent to kill. A juror who had heard only the unadorned stipulation and testimony that the decedent had "possibly" been in some fights might have been left with the sense that the decedent, though hot-tempered, was more prone to use less than deadly force in his neighborhood conflicts, and therefore that Mr. Colbert had not acted in self-defense when the decedent attacked him with the shovel. Detailed testimony about

---

[1] According to the government's two eyewitnesses, the decedent pursued a retreating Ellsworth Colbert and struck him in the head with a shovel, the men grappled with each other and began to fight, and then after the fight the decedent took several steps and fell face first to the ground. During the heart of the fracas, however, the witnesses' view was obscured by a bush.

the North Carolina assault could have convinced that same juror that the decedent was quite capable of using deadly force, lending strength to Mr. Colbert's self-defense claim. If that evidence would convince at least one juror to conclude that the government had failed to disprove self-defense beyond a reasonable doubt—by no means a farfetched scenario—the *Brady* evidence was material.

The government has the file. No one disputes that its contents are exculpatory. *See ante* at 13. Under the circumstances, it was the government's obligation to disclose the evidence to Mr. Colbert.[2] To be sure, defense counsel

---

[2] Although Mr. Colbert made a *Brady* request prior to trial, this obligation exists with or without a request by the defendant. *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). The North Carolina file came into the government's possession while the defense still could have used it at trial, and it is hard to imagine that the government would have concluded at that time that the evidence was not at least arguably material. *See Cone v. Bell*, 556 U.S. 449, 470 n.15 (2009) (noting that "the prudent prosecutor" will "resolv[e] doubtful questions in favor of disclosure"); *Miller v. United States*, 14 A.3d 1094, 1109 (D.C. 2011) (stating that "there is a duty of disclosure even when the items disclosed subsequently prove not to be material"). The concerns the government expressed about "having to represent Mr. Colbert" and "assist his case" or "assist him in his testimony on the stand" by providing him with "detailed . . . investigatory files" that "he may not otherwise have had at his disposal" convey precisely why the government should have turned over the file rather than sought to avoid doing so on the grounds that the evidence might tempt Mr. Colbert to commit perjury on the stand. *See Vaughn v. United States*, 93 A.3d 1237, 1253 (D.C. 2014) (stating that prosecutors "have an obligation under *Brady* to assist the defense in making its case"). And in any event such concerns, even if they materialized, do not justify suppression of *Brady* evidence, but should be dealt with through cross-examination. *See, e.g.*, *Benn v. United States*, 801 A.2d 132 143 (D.C. 2002) (noting that a violation of the rule on witnesses may be remedied

(continued…)

should have done more to focus the discussion on *Brady* and get the trial court to review the file as *Brady* evidence and order its disclosure.[3] But counsel's failure in that regard did not relieve the government of its independent and constitutionally mandated obligation to disclose exculpatory information. Nor can Mr. Colbert have waived his right to challenge the government's failure to disclose a file when he did not know what the government knew—and what the government was so disinclined to "fe[e]d" him—about the file's contents. *See Brooks v. United States*, 39 A.3d 873, 880 (D.C. 2012) (discussing the strong presumption against waiver of a constitutional right and the government's burden of showing "an intentional relinquishment or abandonment of a known right or privilege" (citation omitted)); *Welch v. United States*, 466 A.2d 829, 840 (D.C. 1983) (requiring a "knowing, intelligent act done with sufficient awareness of the relevant circumstances and likely consequences" (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970))).

In the end, the extent to which additional details about the North Carolina

---

(…continued)
by allowing opposing counsel to cross-examine the witness on the nature of the violation, rather than by excluding that witness's testimony).

3    "In arguable cases, the prosecutor should provide the potentially exculpatory information to the defense or, at the very least, make it available to the trial court for *in camera* inspection." *Boyd v. United States*, 908 A.2d 39, 61 (D.C. 2006). Here, the government presented the file to the court, and there was talk of an ex parte review of the file, but the trial court never made a *Brady* ruling or assessed the contents of the file for *Brady* materiality.

offense might have affected the verdict here necessarily depends on the details themselves. Without knowing what that evidence is, we cannot say with confidence that it would not have meaningfully enhanced the evidence of the decedent's propensity for violence. Consistent with our precedent, this court should remand to the trial court with instructions that it place the North Carolina file in the record and assess the file's materiality under *Brady*. *See, e.g.*, *Boyd v. United States*, 908 A.2d 39, 63 (D.C. 2006); *Smith v. United States*, 665 A.2d 962, 968-69 (D.C. 1995) (holding that the trial court abused its discretion by not reviewing a transcript of a witness's prior testimony for potential *Brady* material after the prosecutor acknowledged that it contained "minor inconsistencies"). This would allow us to conduct a de novo review of the trial court's appraisal of the *Brady* information with the benefit of the actual evidence.